Carl E. Douglas (Cal. Bar No. 97011)
  *Carl@DouglasHicksLaw.com*
Jamon R. Hicks (Cal. Bar No. 232747)
  *Jamon@DouglasHicksLaw.com*
Terrence M. Jones (Cal. Bar No. 256603)
  *Terrence@DouglasHicksLaw.com*
D O U G L A S  /  H I C K S  L A W  APC
  5120 Goldleaf Circle, Suite 425
  Los Angeles, California 90056
  (323) 655-6505 | www.DouglasHicksLaw.com

Attorneys for Plaintiffs LINDA PELOQUIN,
ADAM CHOW, TIARA PAULINO,
SHARNIQUE MARTIN, GREGORY VASS,
and OZELL MURRAY

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA PELOQUIN, an individual; ADAM CHOW, an individual; TIARA PAULINO, an individual; SHARNIQUE MARTIN, an individual; GREGORY VASS, an individual; and OZELL MURRAY, an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>TESLA, INC., a Delaware corporation doing business in California as "TESLA MOTORS, INC.," and DOES 1-10, inclusive,<br><br>          Defendants. | Civil Case No. 25-6690<br><br>**COMPLAINT FOR DAMAGES**<br><br>**First Cause of Action**<br>Retaliation<br>(Cal. Gov. Code § 12490(h))<br><br>**Second Cause of Action**<br>Retaliation<br>(Cal. Labor Code § 1102.5(b))<br><br>**Third Cause of Action**<br>Disability Discrimination<br>(Cal. Gov. Code § 12490(a),(h))<br><br>**Fourth Cause of Action**<br>Wrongful Termination in Violation of Public Policy<br><br>**Fifth Cause of Action**<br>Failure to Prevent Discrimination<br>(Cal. Gov. Code § 12940(k))<br><br>**Demand for Jury Trial** |

# **TABLE OF CONTENTS**

I.    NATURE OF THE CASE.................................................................. 1

    A.    Tesla is a Racist and Toxic Place to Work ..................................... 1

    B.    Tesla Repeatedly Fired HR Professionals for Validating
        Reports of Workplace Racism ........................................................ 6

    C.    A Common Denominator:  Nicole Burgers ................................... 8

    D.    Elon Musk was Aware of—and Directly Involved in—the
        Effort to Try to Mitigate the Staggering Degree
        of Turnover Within the Fremont HR Department ......................... 11

II.    JURISDICTION, VENUE & DIVISIONAL ASSIGNMENT ................. 16

III.    PARTIES & RELEVANT NON-PARTIES ............................................ 17

IV.    FACTUAL ALLEGATIONS........................................................... 22

    A.    Karen Draper ................................................................................. 22

    B.    Linda Peloquin .............................................................................. 27

    C.    Adam Chow ................................................................................... 33

    D.    Tiara Paulino & Sharnique Martin................................................ 37

    E.    Gregory Vass................................................................................. 41

    F.    Ozell Murray ................................................................................. 43

V.    CAUSES OF ACTION .................................................................. 49

VI.    DEMAND OF JURY TRIAL .......................................................... 72

VII.    PRAYER FOR RELIEF................................................................. 72

COMES NOW, Plaintiffs—Linda Peloquin, Adam Chow, Tiara Paulino, Sharnique Martin, Gregory Vass, and Ozell Murray (hereinafter, collectively, "Plaintiff")—all California residents permanently domiciled here, who bring this Complaint for Damages and Demand for Jury Trial ("Complaint"), rested upon this Court's diversity jurisdiction, against Tesla, Inc. d/b/a "Tesla Motors, Inc." (hereinafter, "Tesla" or the "Company"), a corporation having its principal place of business in Austin, Texas, and Does 1-10, inclusive (hereinafter, collectively, "Defendant"), alleging, based upon information and belief, the following with respect to Defendants' identities and conduct:

## I.
## NATURE OF THE CASE

### A.    Tesla is a Racist and Toxic Place to Work

1.      By all accounts, Tesla is a racist and toxic place to work—particularly at its facilities in Fremont, California.  Many who have worked there have likened the workplace to the Jim Crow South; an environment in which Black employees and brown-skinned workers are besieged with constant racial abuse, stereotyping, and hostility—including with repeated use of inarguably the most brutal and degrading racial slur in the history of humanity:  *Nigger*.

2.      For nearly a decade now, Black Tesla employees have filed complaints with state and federal anti-discrimination agencies about the pervasive use of racial slurs toward them at work—including "Nigger, "Nigga," "Monkey," "Boy," and "Black Bitch," among others.  Black Tesla employees have reported regularly encountering nooses on desks and other equipment as well as seeing the word "Nigger" graffitied on walls, in bathroom stalls, elevators—even on new Tesla vehicles rolling off the production line:

(*See* Exhibit A, hereto.)

3.      The racist and toxic culture at Telsa has been well-documented and, now, increasingly well-litigated.  For instance, one Black Tesla Fremont employee sued the Company after being regularly subjected to the "N-word" and racial slurs on the factory floor, as well as seeing racist graffiti in the bathrooms.  A federal jury awarded him a multi-million-dollar verdict in 2021.  That employee's case, though, is just one of a litany of instances exemplifying the Company's toxic culture and inability to control the racist, discriminatory, and retaliatory conduct in its workplaces.

4.      State and federal anti-discrimination agencies have received so many complaints about Tesla—particularly from Black employees—that they, too, have taken legal action against the Company on behalf of the government.  In February 2022, California's Civil Rights Department (known then as the Department of Fair Employment and Housing (DFEH)) filed suit against Tesla for injunctive and monetary relief given the extraordinary volume of "complaints by Black and/or

African American workers about racial harassment, racial discrimination, and retaliation lodged over a span of almost a decade[, which] have been futile."

5.     According to the State's complaint, Tesla turned "a blind eye to years of complaints from Black workers who protest the commonplace use of racial slurs on the assembly line" and that the Company continues to be "slow to clean up racist graffiti with swastikas and other hate symbols scrawled in common areas." As the State's complaint also alleges, Telsa supervisory and management officials would then unlawfully retaliate against Black employees who voiced complaints and opposed actions they perceived to constitute unlawful employment discrimination—namely, being called a "Nigger" and "Nigga" in a modern workplace.

6.     For those that spoke out, they wound up shunned, black-balled, subjected to even more intense harassment, or were simply summarily fired under the pretextual guise of "poor performance."  But, of course, invariably, there were no legitimately documented performance issues prior to the termination; rather, the only thing documented was that employee's complaints about the racial abuse and harassment they had experienced.

7.     After the State of California took legal action against Tesla in February 2022, the federal government followed suit by filing its own race-based discrimination case against the Company.  In September 2023, the U.S. Equal Employment Opportunity Commission (EEOC) likewise filed a civil rights lawsuit against Tesla for racial harassment and discrimination against its Black employees.  The suit, brought pursuant to Title VII of the Civil Rights Act of 1964, alleges—just as does the State of California's action—that Tesla "has subjected Black employees at its manufacturing facilities in Fremont, California (Fremont Factory) to severe or pervasive racial harassment and created and maintained a hostile work environment because of their race, in a continuing violation of Title VII."

8.     Much of Tesla's workplace toxicity stems from its rapid sales growth and manufacturing demand, and the breakneck pace at which it hired employees to work in its plants and overall operation.  Since its introduction in 2020, Tesla's "Model Y," for instance, has become the Company's top-selling vehicle line—and, by most estimates, one of the top-selling electric vehicles in the world.  Thus, there was, and remains, constant pressure to keep the Model Y's sales trajectory high.

9.     Yet, as a consequence of this desire to produce vehicles at such a rapid pace, the Company has failed to cultivate a healthy working environment at the Fremont facility, and instead fostered one that is beset with racism, sexism, cronyism, and outright physical violence.

10.     Healthy profits have always been more important to the Company than a healthy working environment.  For Tesla, more bodies on the manufacturing line meant more vehicles flying out the factory door—no matter how unclean the hands were that were assembling those cars.  Thus, Tesla cut corners with respect to background checks by ignoring red flags that would otherwise have been fatal to an employment application and turned a blind eye to individuals with spotty work histories and questionable credentials.  In the end, Tesla has been more concerned about the sheer number of bodies it could get in the door to help push new vehicles out, rather than ensuring that the Company was hiring good people with good work ethic and character—as opposed to blatant racists and misogynists.

11.     With that kind of hastily-hired and poorly-vetted workforce, there have been a multitude of Human Resources (HR) issues from the moment vehicle production—and, in particular, Model Y production—ramped up at the Fremont facility.  There have been poor attendance issues, misconduct and discipline issues, physical fights, acts of sexual deviance, and, of course, repeated instances of racism and sexism.

12.     Given the toxicity of the workplace environment, among other things, there has always been an extraordinarily high rate of employee turnover at the

Fremont facility. On the one hand, because of the tolerance of, and acquiescence to, intentional retaliation against employees that voiced complaints about racial slurs and discrimination, many of those employees either resigned because they could not take it any longer, or were similarly fired for raising those concerns in the first place. On the other hand, in the limited instances when wrongdoers were actually terminated, the need for a workforce increase due to the growing demand for vehicles was so great that many of those disciplinary firings were simply "loopholed" back in through temp agencies. In other words, in order to "work around" the fact that a particular employee had been fired—for cause—and would not ordinarily be subject to rehire, Tesla would simply bring that particular person back in through a temp agency so that that individual would not be subject to Tesla's own internal background check process which would have immediately red-flagged that individual.

13.     This loophole reality contributed to the lack of morale at the Fremont facility and exacerbated the toxicity there. Everyone realized—both wrongdoers and high performers alike—that there were no real consequences at Tesla for the violation of any anti-discrimination or anti-retaliation policy, nor any true workplace accountability of any kind.

14.     According to the former Senior Manager of Physical Security Operations who had responsibility over safety and security at the Fremont facility, that meant that even employees that had been terminated for instances of workplace violence were loopholed back in via temp agencies. That meant, then, that oftentimes the employee who had been previously victimized had to actually resume working with their attacker and tormentor.

15.     In fact, that Senior Security Manager himself was attacked and suffered a serious injury when he attempted to stop a loopholed employee—one who had been returned to work after being terminated for cause—after that employee came back aboard and attacked another worker.

**B.    Tesla Repeatedly Fired HR Professionals for Validating Reports of Workplace Racism**

16.    The Tesla HR professionals that worked at the Fremont facility tried their best to manage the never-ending cascade of issues, complaints, and investigations that arose on a day-to-day basis there.  However, those professionals quickly began to realize that in substantiating many of the complaints they investigated—particularly with respect to discrimination and retaliation—that they themselves were then subjected to reprisal for simply doing their job and validating those well-founded reports.

17.    As a bizarre and misguided kind of institutional deflection, rather than try to resolve the underlying problem—a toxic, racist, and retaliatory workplace environment—Tesla instead turned its ire on the HR professionals that had merely investigated and substantiated the bases of the complaints.  So, oddly, in most instances it was the HR official that wound up being penalized and pushed out for substantiating the alleged wrongdoing rather than the wrongdoer themselves.  Consequently, a dizzying number of HR professionals—the Plaintiffs here:  Peloquin, Chow, Paulino, Martin, and Vass, among them—have either been outright fired for substantiating complaints of discrimination and retaliation, or resigned because they saw a termination coming and did not want that type of disciplinary stain on their job history.

18.    A Fremont Operations Manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave. An HR Manager refused the Operations Manager's repeated requests to terminate the employee for taking medical leave since, of course, that would have constituted illegal disability-based retaliation.  But yet, it was the HR Mananger that was fired for "poor performance" after validating the discriminatory basis of the Operations Manager's motivation to terminate the worker on medical leave.

19.    A manufacturing employee made an angry comment to a Black

employee, asking him, "Do you want to hang by a tree?"—plainly threatening to lynch him as were thousands upon thousands of Black men and women during and after Slavery.  An HR professional investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be physically threatening and racially derogatory, and, so, the HR professional recommended that the offending employee be terminated.  But yet, the HR professional was chastised and given a poor rating on his performance evaluation.  He was then threatened with agreeing to either a "Performance Improvement Plan" with benchmarks that were intentionally unachievable or to a severance package with strict legal recourse waivers and nondisclosure language.  Either way, the message was clear:  Tesla wanted him gone.  So, he had no choice but to resign to avoid that stain on his job record.

20.     That HR professional's direct supervisor spoke up in defense of his investigation and performance.  She had supervised his "hang by a tree" investigation and endorsed his termination recommendation.  But yet, she, too, was then terminated for "poor performance."  Remarkably, her termination came after her Tesla HR higher-ups told her that the number of validated race-based complaints at Fremont was too high and that they as HR managers needed to somehow reduce those numbers—particularly in light of all the pending litigation against the Company by State and Federal regulators.

21.     Following those alarming and clearly retaliatory terminations, two HR professional drafted and sent an email to high-level operations officials at the Fremont facility explaining, among other things, their fear of retaliation simply for investigating and validating employees' workplace complaints—which was their fundamental job function.  They were fired just weeks later as well.  And the list goes on.

22.     Accordingly, this is a wrongful termination action brought pursuant to California's Fair Employment and Housing Act (Cal. Gov. Code § 12940 et seq.)

("FEHA") in which these Plaintiffs individually and collectively allege that they were outright fired or constructively terminated as a consequence of their protected activities and characteristics.  As set forth in further detail herein, these Plaintiffs individually and collectively voiced concerns, objections, and complaints about the discriminatory and retaliatory practices that Tesla officials engaged in at the Fremont facility and, as a consequence, they were each pushed out of their Tesla employment as a direct result.  Thus, this lawsuit seeks to redress the financial and emotional harm they suffered, and continue to suffer, as a result of the reprisal they endured while employed with Tesla, as well as on account of their wrongful termination.

**C.    A Common Denominator:  Nicole Burgers**

23.    A common denominator in many of these terminations is a HR Manager named Nicole Burgers.  By all accounts, Burgers has had an irrational fixation on fostering the delusion that the environment and culture at Tesla is one of tolerance and innovation, rather than racism and retaliation.  By all accounts, given that Burgers was the overall HR manager for the entire Fremont facility, she believed that she would be held accountable for further instances of racism and misconduct at the Fremont location—particularly in light of the pending State, Federal, and private litigation against the Company.  Thus, rather than undertake to change the culture and environment that fostered those types of instances of racism, Burgers instead undertook to weed out the HR professionals beneath her that merely investigated and substantiated the occurrence of that type of depravity.

24.    Invariably in each of those cases, the HR professional had merely been charged with investigating yet another instance of discriminatory conduct at the Fremont facility, concluded that the event was substantiated given their investigation, and wished to take some sort of remedial action to stop it or otherwise penalize the person who did it.  Yet, when Burgers and her Texas headquarters-based HR managerial counterparts—Allie Arebalo, Bert Somsin,

Jenifer Romero, and Leah Allen—became aware of those investigations and outcomes, it engendered in them retaliatory animus toward the HR professional rather than the actual underlying wrongdoer.  Rather than let another instance of racism get out—or, especially, rather than have to document another instance of racism while litigation was actively pending against the Company—Burgers and her Texas counterparts made sure that the HR professional was pushed out instead.  Those revelations, Burgers believed, would adversely impact perception of her ability to lead the HR effort at the Fremont facility and her ability to change its culture and environment in a positive way.

25.    So, the directive from Burgers and her Texas-based HR managerial counterparts was for Fremont HR professionals to "re-frame" the bases of employees' complaints so that the claims would not be characterized as "race-based" even though that was plainly the case.  As one of many former Telsa HR employees has attested under oath:

> As HR professionals in Fremont, we were all quite aware—as a consequence of the many validated instances of racism and retaliation at the plant—when the State of California's Department of Civil Rights filed suit against Tesla in February 2022.  As a result, the messaging I received from our leadership was that were supposed to try to "reframe" the alleged instances of racism and retaliation we were responsible for investigating in light of that litigation and the likelihood of exacerbating the company's exposure with newly-validated incidents.  I understood that we were supposed to do our best to try to create an alternative "narrative" for incidents so that they did not appear to be race-based.  We were supposed to try to find ways to recharacterize the nature of our investigation and its outcome so that the central issue was predicated on something other than race, even though that was not the truth.

(*See* Exhibit B, hereto.)

26.    Burgers' modus operandi was generally the same in each instance when the HR professionals working beneath her did not comply with that directive.

Whereas the HR professional had previously received above-average performance reviews, now—as a consequence of their investigation—there was suddenly a "performance issue." Or there was suddenly a need to open an investigation against the HR professional for some petty, inconsequential, or outright fabricated incident. Burgers would then summarily terminate the HR professional—without any progressive discipline or coaching—on the grounds that their performance had suddenly fell off a cliff such that they needed to be walked out the door immediately.

27.    And that circumstance, too, was both literal and intentional. In an effort to humiliate the HR professional and to send a message to others who might be considering disclosing the same type of instances of racism and retaliation, Burgers would intentionally have security escort the HR person out the door—as a kind of "perp walk"—so that the other HR professionals would see that "walk of shame" and appreciate the fate that could likewise befall them. Burgers would order this done especially where the HR professional was a manager and team leader so that their subordinates would see their supervisor being walked out like a petty thief.

28.    According to the Fremont facility's long-time Senior Security Manager, Ozell Murray—who is aligned with these HR professionals—that was frequently Burgers' direct request of he and his team. And according to Murray, that type of one-on-one escort was not something routinely done for any other department except for when Burgers terminated the HR professionals working beneath her.

29.    "A PIP or a package." That was the "Hobbs Choice" Burgers presented to the many Tesla HR professionals she and her Texas-based HR counterparts pushed out; either accept an unattainable Performance Improvement Plan or accept a modest payout and leave. Regardless, the writing was on the wall: You're out.

30.     As one of many former Telsa HR employees has also attested under oath:

> Burgers was vindictive and retaliatory.  As the Fremont HR lead, I think Burgers believed that the toxic environment reflected poorly on her leadership ability, so she retaliated against those of us who spoke up.  Frequently, what I saw Burgers do was to open investigations against people for issues that were petty or otherwise grossly exaggerated as a means of "papering" your file to make you appear to be the wrongdoer and poor performer.  This would be the case even if you had just received positive reviews and feedback during your most recent formal performance assessment.  Regardless, Burgers would suddenly blindside you with some overstated issue that she claimed reflected so negatively on your performance that it warranted separation and a severance package.

(*See* Exhibit B, hereto.)

**D.     Elon Musk was Aware of—and Directly Involved in—the Effort to Try to Mitigate the Staggering Degree of Turnover Within the Fremont HR Department**

31.     As a consequence of the Fremont facility's general danger and dysfunction, Elon Musk, the co-founder and CEO of Tesla, frequently visited the facility and walked the floor of the Model Y production line in particular.  Musk leads all product design, engineering and global manufacturing of the Company's electric vehicles, battery products, and solar energy products.  Musk frequently sat down for face-to-face meetings with Model Y employees in Fremont—of all levels and degrees of authority—to directly discuss a myriad of issues, including manufacturing efficiencies and production problems, Company culture and work environment, and the recruitment and retention of employees.

32.     Musk was a frequent visitor to the facility—and not just for high-level photo opportunities, but to take a hands-on approach to managing, directing, and facilitating resolution of the manufacturing and workforce issues at the plant.

Musk would frequently visit the plant and conduct issue-resolution meetings with actual line employees, not just upper management bureaucrats. Musk would hold meetings with line-level employees from every function of the plant—from the manufacturing line to operations to HR—and issue directives right then and there to resolve the issues employees raised.

33. For instance, Musk would promote individuals right on the spot who, by his estimation, he believed could perform better in a particular position or otherwise accomplish a task or function more efficiently. As well, Musk would eliminate certain positions and functions that he considered to be bloat and inefficient to the manufacturing process. Musk would also reassign certain functions that were being managed from afar, like from Tesla's headquarters in Texas, to an individual directly on site in Fremont who had actual daily contact and exposure to the issues at the plant.

34. And Musk would repeatedly tell employees that they had an open line of contact with him, frequently telling workers to email him directly if and when his directives were not being followed and executed. That occurred in many of the instances and with many of the Plaintiffs' situations described herein, but to no avail.

35. Musk's hands-on approach was equally true vis-à-vis the Fremont HR staff which, in 2022, was struggling with a variety of issues—and, in particular, a lack of trusted HR leadership to help steer them through Fremont's many challenges.

36. As above, Musk was known to make personnel changes right there on-the-spot when he determined the situation warranted it. Notably, in February 2022, Musk personally promoted a woman named Aenoi Jones to become the overall HR leader for Tesla's Fremont facility. After meeting with the HR team, Musk decided right then and there that Jones was the best person to fill that leadership role. Given that he is the CEO of the Company, Musk obviously

1  expected that his personal personnel directives would be executed.

2      37.    Another of these kind of "instant-change" meetings occurred with the

3  HR team just a few months later in June 2022, when Musk visited the Fremont

4  facility and met with the entire HR team.  The need for the meeting came about

5  because of the alarming rate of turnover among HR Professionals in Fremont.

6      38.    The HR professionals at Fremont were assigned an extraordinarily

7  large number of employees to manage which, in turn, begat an extraordinarily

8  large number of investigations to conduct—particularly with respect to race-based

9  allegations of wrongdoing—which the HR professionals were then themselves

10 retaliated against for substantiating.  That then demoralized the HR staff members

11 and brought about a number of terminations and resignations, which then

12 exacerbated the overall turnover rate in Fremont.  There was already a high

13 turnover rate amongst operational employees; that was the larger issue that was

14 supposed to be assuaged by a robust HR team.  But the HR team itself was rapidly

15 bleeding away—in which case there were no problem-solvers to help solve the

16 overarching problem.  As a result, Musk visited the facility on June 9, 2022,

17 to help resolve the multi-layered issues:



28 (*See* Exhibit C, hereto.)

39.    But, again, Musk's visit was not simply for a "photo op" and handshake session.  As with the previous February 2022 sit-down, the June 2022 meeting was purposeful and meaningful such that Musk could himself undertake to resolve some of issues that were plaguing the Fremont facility and its HR department.

40.    Among the issues discussed during that June 2022 Musk meeting was the attrition rate amongst employees in manufacturing operations.  The production demand for Tesla vehicles was exploding, but Fremont's HR team was having a hard time hiring and retaining employees to keep up with the workforce need. Among the reasons for that challenge was, of course, the rampant occurrence of racism and retaliation at the plant that poisoned the workplace environment.

41.    The attrition problem amongst operations employees was then having a derivative effect on the attrition rate amongst Fremont's HR STAFF.  The HR professionals felt overworked, under-supported, and undermined by their leader, Nicole Burgers—and particularly given that the HR staff understood that Aenoi Jones had instead been hand-selected by Musk to run the department.

42.    The HR staff was besieged with complaints and investigations of racist incidents at the Fremont facility, and was demoralized by the implicit and explicit pressure to try to "reframe" those incidents as something other than what they plainly were because of all the pending litigation.  Consequently, HR professionals were likewise leaving the Company.

43.    One of the issues that an HR professional named Karen Draper articulated during the Musk meeting was that the HR manager who was designated to be the internal inward-facing point-person with respect to personal and professional support for Tesla's HR professionals—a management position the Company called "HR-for-HR"—was an individual who was physically situated in Tesla's Texas headquarters.  Thus, Draper, among others, believed that that HR-for-HR manager would be more impactful if they were actually on the ground

in Fremont rather than merely available virtually from afar.  Musk agreed.

44.     Moreover, impressed by Draper's insight, poise, and performance, Musk told Draper that he wanted her to fill that HR-for-HR management role in Fremont.  Draper accepted, so Musk promoted her right there on-the-spot.  Musk believed that Draper was better-suited to take on the role given her talent and poise, and given the impracticality and inefficiency of the role being performed by a Texas-based manager.  As with his decision to appoint Aenoi Jones as the overall HR lead in Fremont—not Nicole Burgers—Musk articulated that he expected his Draper promotion and other personnel directives to be executed.

45.     At the conclusion of the meeting, Musk asked Draper to compile her notes about his decisions during the meeting, as well as the participants' other discussions, and email them to him that night so that they would be memorialized in writing.   Draper did so that same evening after first consulting with Aenoi Jones about the email's contents, as well as with Hrushikesh Sagar, Fremont's overall production manager, who were both present during the June 9 meeting.  The email indicated, as Musk had dictated, that, effectively immediately, the HR-for-HR role would be reassigned from a manager in Texas to Draper in California:

> **From:** Karen Draper <kadraper@tesla.com>
> **Date:** Thursday, June 9, 2022 at 11:13 PM
> **To:** Elon Musk
> **Cc:** Hrushikesh Sagar                    , Aenoi Jones
> **Subject:** HR Fremont Team (Skip-Level) Meeting 6/8/22 Follow Up
>
> Hello Mr. Musk,
>         As discussed, please find below the notes from the 6/8/22 on-site meeting with HR Fremont, CA. Please review and reply as appropriate. Thank you.
>
> **2/22/22 – Previous Meeting Task Updates**
>   1.  Parking Lot – additional light installation
>   2.  Security Team Enhancements
>   3.  Additional Surveillance/Camera System Upgrades
>   4.  On-site LOA and Payroll Personnel
>
> **Meeting Minutes**
> In alignment with Elon's expectations - all Business and HR Leaders will be physically present at the locations they lead/support:
> Effective Immediately – **Aenoi Jones**, will assume the role of Site HR Leader (HR Director) @ Fremont, CA
>         (as previously assigned by Elon on 2/22/22)
> Effective Immediately -HR for HR role/responsibilities will be reassigned from:
>         **Allie Arebalo @ Giga, TX > Karen Draper @ Fremont, CA.**

(*See* <u>Exhibit D</u>, hereto.)

46.     A little over a week later, on June 18, 2022, after some follow-up emails from Jones and Sagar, Musk responded to the email thread that Draper started on June 9.  In Musk's email, he approved Jones' earlier emphasis that Sagar would have the authority to approve Musk's personnel decision, which included approval of Draper's promotion to the Fremont-based HR-for-HR role as discussed during the subject meeting.

47.     As a consequence of Musk's personal and direct involvement in Draper's case, the retired judge presiding over her wrongful termination action against the Company ordered Musk to appear for deposition.

> Tesla did not submit one supporting declaration with its briefing papers for this motion from any Tesla employee present at the subject meeting attesting to the Company's contention that Musk did not promote Ms. Draper to the HR-for-HR manager position that day. Respondent has not established "good cause" for precluding Musk's deposition because it has not produced anything, other than argument, to dispute Claimant's actual evidence in support of her position. Accordingly, Claimant should be permitted to depose Elon Musk relative to the issues described herein.

(*See* Exhibit E, hereto.)

## II.

## JURISDICTION, VENUE & DIVISIONAL ASSIGNMENT

48.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  As set forth below, Plaintiff is diverse from all Defendants in this litigation and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

49.     The Court has personal jurisdiction over Defendant in that Tesla is registered to do business and, in fact, does do substantial business within the State of California and within the Northern District of California.

50.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the acts or omissions giving rise to

Plaintiff's claims occurred within this judicial district, namely, within Alameda County.

51.     Prior to the initiation of this action before this Court, Plaintiff properly exhausted their administrative remedies as required under FEHA by filing a complaint against Defendant with the California Department of Civil Rights ("DCR") alleging, inter alia, the claims asserted herein.  DCR issued Plaintiff a "right-to-sue" letter on August 7, 2025.  Accordingly, Plaintiff has fulfilled all preconditions to the filing of this FEHA-based suit.  (Collectively attached hereto as Exhibit F are true and correct copies of those right-to-sue letters.)

52.     Assignment to this Division is proper, consistent with Civil L.R. 3-2(c), in that a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred within Alameda County.

## III.
## PARTIES & RELEVANT NON-PARTIES

53.     Plaintiff Linda Peloquin is an individual who, at all times material to the allegations of this Complaint, was domiciled in California, living here with the intention of permanently residing in this state.  At all times material to the allegations of this Complaint, Plaintiff was a resident of Alameda County, which is situated within this judicial district.

54.     Plaintiff Adam Chow is an individual who, at all times material to the allegations of this Complaint, was domiciled in California, living here with the intention of permanently residing in this state.  At all times material to the allegations of this Complaint, Plaintiff was a resident of Los Angeles County, which is situated within this judicial district.

55.     Plaintiff Tiara Paulino is an individual who, at all times material to the allegations of this Complaint, was domiciled in California, living here with the intention of permanently residing in this state.  At all times material to the

allegations of this Complaint, Plaintiff was a resident of Alameda County, which is situated within this judicial district.

56.    Plaintiff Sharnique Martin is an individual who, at all times material to the allegations of this Complaint, was domiciled in California, living here with the intention of permanently residing in this state.  At all times material to the allegations of this Complaint, Plaintiff was a resident of Alameda County, which is situated within this judicial district.

57.    Plaintiff Ozell Murray is an individual who, at all times material to the allegations of this Complaint, was domiciled in California, living here with the intention of permanently residing in this state.  At all times material to the allegations of this Complaint, Plaintiff was a resident of Los Angeles County, which is situated within this judicial district.

58.    Plaintiff Gregory Vass is an individual who, at all times material to the allegations of this Complaint, was domiciled in California, living here with the intention of permanently residing in this state.  At all times material to the allegations of this Complaint, Plaintiff was a resident of Alameda County, which is situated within this judicial district.

59.    Defendant Tesla, Inc., doing business as "Tesla Motors, Inc.," is, as Plaintiff is informed and believes, and on that basis alleges, a corporation organized under the laws of the State of Delaware which, at all times material to the allegations of this Complaint, had its principal place in Austin, Texas and was registered by the California Secretary of State to do business in California. Plaintiff is further informed and believes, and on that basis alleges, that Tesla is a business entity which, generally, operates as a manufacturer of electric motor vehicles.

60.    Plaintiff is further informed and believes, and on that basis alleges, that at all times mentioned herein and otherwise relevant to the allegations of this Complaint, FEHA was in full force and effect, and binding on Tesla, as the

Company regularly employed more than five persons within the State of California thereby bringing Tesla within the provisions of FEHA's statutory scheme.

61.     Plaintiff is ignorant of the true names and capacities of the defendants sued as DOES 1 through 10, inclusive (the "DOE Defendants") and, therefore, sues these DOE Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

62.     Plaintiff is informed and believes, and on that basis alleges, that the DOE Defendants acted wrongfully, maliciously, intentionally, and negligently; that each is responsible in some manner for the events and happenings complained of herein; and that Plaintiff's injuries, as alleged herein, were proximately caused by the DOE Defendants, either through each Defendant's own conduct or through the conduct of their agents and/or employees.

63.     Plaintiff is informed and believes, and on that basis alleges, that at all times material to the allegations of this Complaint, each of the Defendants, whether named or fictitiously named as a DOE Defendant, were the merging entity, merged entity, subsidiary, acquiring corporation, agent and/or employee of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and/or employment with knowledge, advice, permission and consent of each other.

64.     As used herein, the term "Defendants" means all Defendants, both jointly and severally, and references by name to any one Defendant shall include and reference all Defendants, both individual, corporate, and business entities, both specifically named and unnamed, and both jointly and severally to all.

65.     Plaintiff is further informed and believes, and on that basis allege, that at all times material to the allegations of this Complaint, Defendants caused, aided, abetted, facilitated, encouraged, authorized, permitted, and/or ratified the wrongful acts and omissions described in this Complaint.

66.     At all times material to the allegations of this Complaint, the Fremont

location was the corporate duty station for approximately 50 HR professionals.  In additional to the Model Y, the Fremont plant also produced vehicles from Tesla's Model S, Model 3, and Model X lines.

67.     At all times material to the allegations of this Complaint, Plaintiff's principal physical duty-station was located within Tesla's Fremont facilities.  Among Plaintiff's managers within the hierarchical chain were the following individuals:

- Allie Arebalo, Senior Human Resources Director
- Bert Somsin, Senior Human Resources Director
- Nicole Burgers, Senior Human Resources Manager
- Jenifer Romero, Senior Human Resources Manager
- Leah Allen, Senior Human Resources Business Partner, HR-for-HR Manager
- Ray Sethna, Physical Security Director

68.     Each of these individuals had the authority to, and often did, control Plaintiff's day-to-day tasks and functioning as one of their direct-reports.  Each of these individuals dictated Plaintiff's daily execution of their HR-based and security-based role, endorsed their decisions, overruled their decisions, and provided them advice and counsel with respect to issues that came up at the Fremont location.

69.     At all times material to the allegations of this Complaint, each of the individuals listed in the preceding paragraph was a managing agent within Tesla's corporate hierarchical structure.  Each of the HR Managers and Directors was a high-level Tesla official and directly responsible for overseeing Tesla's entire HR operation, including at its Fremont facility.  In that role, each of these individuals exercised substantial discretionary authority over decisions that ultimately determined Tesla's HR and organizational policy.  Each of them conceived of and implemented Company HR policies and practices, determined HR-related budgets,

and hired and fired both HR and Operations staff.  Each of them had the authority and discretion:  to dictate and implement corporate policies and standards for the recruitment, hiring, and training of HR and Operations staff, from associate to management-level employees; to dictate and implement recruitment campaigns specifically-targeted to the demographics of their region's employee base; and, to dictate and implement formal policies and informal practices at the overall Fremont facility with respect to responding to employees' complaints of workplace discrimination, harassment, and other complaints of perceived violations of the law and breaches of Company rules and policy.

70.    At all times material to the allegations of this Complaint, Ray Sethna was a managing agent within Tesla's corporate hierarchical structure. Sethna was a high-level Tesla official and directly responsible for overseeing Tesla's global security apparatus, including at its Fremont facility.  In that role, Sethna exercised substantial discretionary authority over decisions that ultimately determined Tesla's physical security policies.  Sethna conceived of and implemented Company safety and security policies and practices, determined security-related budgets, and hired and fired security staff.  Sethna had the authority and discretion:  to dictate and implement corporate policies and standards for the recruitment, hiring, and training of security staff, from associate to management-level employees; to dictate and implement recruitment campaigns specifically-targeted to the demographics of his region's employee base; and, to dictate and implement formal policies and informal practices at the overall Fremont facility with respect to responding to security incidents, safety violations, medical emergencies, and other perceived violations of the law and breaches of Company rules and policy.

# IV.

## FACTUAL ALLEGATIONS

71.     Plaintiff incorporates by reference each and every of the foregoing paragraphs, above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

**A.     Karen Draper**

72.     Karen Draper was one of the first dominos to fall in what became a long line of retaliatory terminations by Burgers and her Texas-based counterparts—Allie Arebalo, Bert Somsin, Jenifer Romero, and Leah Allen—or, instances where other HR professionals simply resigned under protest because they knew Burgers had begun to target them.

73.     In Draper's situation, an operations manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave.  Draper refused the operations managers' repeated requests to terminate the employee for taking medical leave since, of course, that would have constituted illegal disability-based retaliation.  Draper complained to Burgers that the manager's conduct already constituted illegal retaliation and would likely to subject Tesla to liability.  This unfolded in December 2022—after State and Federal regulators had filed civil rights suits against Tesla.  Understanding that reality, Burgers turned her ire on Draper rather than the manager.  Burgers then opened a misconduct investigation into Draper's behavior rather than the manager's retaliatory misconduct.  Draper was fired two months later for "poor performance."

74.     In May 2023, Draper filed a federal lawsuit against Tesla alleging that she was wrongfully terminated in violation of California's Fair Employment and Housing Act.

75.     Plaintiff Karen Draper is a Black female.  Draper received her

undergraduate degree from UCLA.  Draper has spent the majority of her professional career working in the Human Resources field, having worked in high-level HR positions for the past 17 years.  Draper has worked for a number of Fortune 500 companies and excelled in each position she has held.

76.     On or about February 28, 2022, Draper began working for Tesla as a "Senior Human Resources Business Partner."  Such was an HR management position for which Draper was generally responsible for managing approximately five subordinate HR representatives in the provision of HR-related services to auto production employees.  Specifically, Draper was assigned to oversee the provision of HR-related services to production employees for Tesla's Model Y vehicle at the Company's manufacturing plant in Fremont, California.

77.     In September 2022, a Tesla production supervisor named B.M. submitted the appropriate medical documentation and internal paperwork to take an FMLA-protected leave of absence, which was approved.

78.     Despite the medical necessity and B.M.'s compliance with Tesla's internal policies and procedures for taking such leave, her absence engendered in B.M.'s manager—Kristopher Lindsey—retaliatory animus toward her and a stated desire to fire B.M. while she was out.  Lindsey conveyed his desire and requests to fire B.M. openly and repeatedly—in emails to HR and other operational managers, during face-to-face meetings with HR and other operational managers, and with clear disdain for B.M. during team meetings with his direct-reports and B.M.'s peers and coworkers that she "was not welcome back."  Lindsey was personally and irrationally fixated on getting B.M. terminated despite the fact that she had done nothing wrong other than to exercise her statutory rights to take protected medical leave.  B.M. did not have any significant documented performance deficiencies; Lindsey was able to back-fill B.M.'s position during her leave such that her absence did not adversely impact Tesla's manufacturing operation; and B.M. had been compliant while on leave with her obligations to submit appropriate

medical documentation and internal leave forms timely and upon request.

79.    Still, Lindsey was rabid about getting B.M. terminated.  Lindsey began lashing out at the HR representatives that attempted to calm him down and explain that it was illegal—and would likely subject Tesla to liability—if they executed his request to terminate B.M. without cause while she was on protected leave.  On at least three separate occasions, Draper sent her direct-reports to personally discuss with Lindsey his requests to terminate B.M. and to explain to him that there was no legal or practical basis to do so.  Yet, in each instance, Draper's direct-reports returned from their respective interactions with Lindsey complaining of his loud, aggressive, and maniacal behavior toward them when discussing B.M., as Lindsey continued to press each of them to execute on his groundless requests to terminate her.  It was plain to each of Draper's direct-reports that Lindsey had some kind of personal vendetta against B.M. that was clouding his judgment.  Moreover, whatever vengeful crusade Lindsey was mounting was causing him to lash out at HR and operational representatives in a rude, abrasive, and unprofessional manner.  They each reported back to Draper after their respective meetings with Lindsey that he had yelled at, belittled, and disrespected them, and that they were uncomfortable having further interactions with Lindsey going forward.

80.    Consequently, on December 9, 2022, Draper held her own meeting with Lindsey to try herself to explain to him that terminating B.M. while on protected leave and without cause was illegal and would likely subject Tesla to liability.  Yet, just as in previous instances, Lindsey was loud, rude, rabid, and intransigent with Draper during their meeting about his position that B.M. could and should be fired while out on FMLA leave.  Following her meeting with Lindsey, which was attended by two other HR representatives and an operational manager, Draper immediately reported his behavior to Burgers.  Yet, Burgers did not react the way in which Draper anticipated.  Instead of validating Draper's

admonishment to Lindsey that it would be illegal to fire an employee on protected leave for no reason, and instead of validating Draper's description of Draper's own firsthand experience with Lindsey's aggressive obsession with terminating B.M., Burgers turned on Draper and opened an investigation against her for not capitulating to a production manager's demands.

81.     Among other reasons, Draper's refusal to capitulate to Lindsey's demands engendered retaliatory animus in Burgers toward Draper.  Lindsey was a production manager for one of Tesla's highest volume vehicles, its "Model Y." Thus, there was a significant amount of institutional pressure to keep Model Y production on course, which meant keeping Model Y production managers, like Lindsey, happy.  The Model Y production managers wielded a lot of institutional power within the Company and, as above, frequently held face-to-face meetings with Musk.

82.     The hostility toward Draper was also rooted in race-based animus and bias against Draper as a Black woman.  Despite witness statements to the contrary, Draper's managers characterized her interactions with Lindsey as the product of being an "Angry Black Woman," a racial trope that stereotypes Black women as inherently short-tempered, ill-mannered, and over-bearing.  Burgers accused her of being "aggressive" and "out-of-control" with Lindsey—a Caucasian male—while merely describing him as "passionate" and "animated," a race-based disparity that Draper was quick to confront her about.

83.     Thus, Draper's refusal to acquiesce in Lindsey's illegal crusade to fire B.M. engendered in Burgers and her managers retaliatory animus toward Draper insofar as they believed that they could be held responsible for not fostering an environment that coddled and appeased Model Y production managers, like Lindsey.  So, Burgers fired Draper instead.

84.     And there was the broader context that motivated Burgers as well.  As set forth above, Burgers was motivated by a desire to suppress additional findings

of retaliation arising out of the Fremont facility because of the pending litigation against Tesla. As the facility's overall HR lead, Burgers believed that additional findings would negatively impact assessment of her ability to eliminate the culture of racism and retaliation in Fremont and to impact the workplace environment in a positive way.

85.    On February 10, 2023—in just over 60 days' time following Draper's face-to-face meeting with Lindsey and refusal to terminate B.M.—Burgers called Draper into a meeting with Burgers' Texas counterparts and abruptly terminated Draper's employment. Burgers offered Draper no explanation for the basis of her termination other than it was for unspecified "performance issues." But that was pretext. The real reason that Draper was fired was because she refused to execute Lindsey's, Burgers', and others' requests to fire B.M. while she was on a protected FMLA leave.

86.    And to be sure, Draper did not have any legitimate "performance issues." At no point during Draper's Tesla employment, and certainly not during the intervening period between her subject interaction with Lindsey and her termination, did she have any legitimate "performance issues." She had glowing performance reviews. She had never been issued any corrective actions. She had never been informally chastised for insubordination or dereliction of her duties. She did not have any attendance or tardiness problems. To the contrary, Draper excelled in her position from the moment she was hired. And, in June 2022, just six months before her final meeting with Lindsey and readout with Burgers, Draper had been personally promoted by Elon musk because of superior performance.

87.    The proffered basis for Draper's termination was pretextual. The decision to fire Draper was not truly the result of "performance issues," but was instead rooted in retaliatory animus based upon Draper's refusal to engage in what she believed in good faith to be an illegal act on Tesla's behalf—that is, to execute the termination of B.M. while she was on protected FMLA leave. It was also a

direct consequence of race-based animus and bias against Black women.

88.    On May 5, 2023, Draper filed a federal lawsuit against Tesla alleging wrongful termination based upon race and retaliation.  Tesla was able to force that suit out of public view and into private arbitration because Draper, as are with most Tesla employees, was forced to sign an arbitration agreement as a condition of employment with the Company.

89.    Ultimately, in April 2025, after the Arbitrator entered an order permitting Draper's attorneys to depose Elon Musk, as described above, Tesla entered into a settlement agreement with Draper to resolve her claims.

**B.    Linda Peloquin**

90.    Linda Peloquin became the next managerial domino to fall after Burgers fired Draper.  Peloquin was similarly fired in retaliation for complaining and speaking out against Tesla's refusal to fire an employee for patently racist misconduct.  In Peloquin's situation, a manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"  This incident, too, occurred after DCR and the EEOC filed suit against Tesla and were already investigating the Company.

91.    One of Peloquin's direct reports investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be racially-derogatory, and, so, that HR professional recommended that the manufacturing employee be terminated.  Peloquin concurred.

92.    Yet, bizarrely, Burgers chastised the HR professional instead of endorsing his termination recommendation.  Peloquin spoke up to Burgers in defense of her direct report's performance, investigative findings, and termination recommendation of the racist wrongdoer.  Peloquin had supervised his "hang by a tree" investigation and endorsed his findings.  Yet, as with Draper, Burgers turned her ire on Peloquin, accused her of "poor performance," and terminated her employment less than a month later.

93.     Plaintiff Linda Peloquin is an Asian female.  Peloquin has spent the majority of her professional career working in Human Resources, having worked in high-level HR positions for the past 25 years.  Peloquin has worked for a number of Fortune 500 companies and excelled in each position she has held.  Until her retaliatory termination from Tesla, Peloquin had never before been fired from a job.

94.     On or about March 27, 2023, Peloquin began working for Tesla as a "HR Manager."  Such was an HR management position for which Peloquin was generally responsible for managing approximately 11 subordinate HR representatives in the provision of HR-related services to auto production employees.  Specifically, Peloquin was assigned to oversee the provision of HR-related services to production employees for Tesla's Model S, 3, X, and Y vehicles at the Company's manufacturing plant in Fremont, California.

95.     Peloquin never received any bonafide corrective actions during the course of her employment with Tesla.  She was never written up.  She was never formally or informally disciplined.  She never had any attendance issues.  And she never received any negative performance reviews or work evaluations.  To the contrary, both her superiors and subordinates consistently praised Peloquin's work execution and lauded her management prowess.  So, too, did the operational colleagues she worked with throughout the Company on various matters and projects.

96.     The final incident that led to Peloquin's termination occurred in or about December 2023.  A few months earlier, one of Peloquin's direct reports, an HR associate named Adam Chow, received a complaint from a manufacturing employee about a racially-motivated incident that that employee perceived to also be a threat of violence.

97.     As the complaining employee and another employee were working on a vehicle, he called out to his coworker to stop him from closing a door and

causing damage to the car.  The coworker responded by angrily yelling back, "Do you want to hand by a tree?"

98.     The complaining employee, who is Black, was astounded by what his coworker, who is Caucasian, had yelled at him.  He understood the comment to be referring the lynching of Black men, so was threatened and offended by it—particularly because of the overall racial tension and toxicity in the Fremont facility.  He reported it to HR and Chow was ultimately assigned to investigate the incident.

99.     As a consequence of his investigation, Chow validated that the incident occurred, that it was racially motivated, and that it was physically threatening in nature—all in violation of Tesla's anti-violence and anti-racism policies.  Among other things, the wrongdoer had texted the complaining employee a purported apology the next day, thus, conceding that he had indeed made the statement—but then, not knowing that Chow possessed the texts, denied during his interview with Chow that he said anything at all.

100.    Consequently, Chow recommended that the employee be fired for violating the Company's anti-racism and anti-violence policies, as well as for a lack of candor.  The wrongdoer's operational supervisory chain agreed.  So, too, did Peloquin, Chow's direct supervisor, who found the employee's statements to be an intentional reference to the lynching of Black men that was pervasive for hundreds of years in this country.

101.    Both Peloquin and Chow recommended to Burgers that the employee be terminated for that depravity, but Burgers disagreed.  Again, Burgers and her Texas-based counterparts were fearful that another instance of racism and racially-motivated violence would reflect poorly on their leadership—particularly given the State and Federal lawsuits against Tesla.

102.    So, ultimately, in an effort to downplay, contain, and conceal further instances of racist conduct at Tesla in the midst of the California Civil Rights

Department's suit against the Company for racial misconduct, Burgers fired Peloquin (and later Chow, as described below) rather than the racist employee.

103.    In or about November 2023, when Peloquin challenged Burgers about her decision to overrule the termination recommendation, Burgers contended that Chow had prior discipline and "performance problems," and that his investigation was not done in accordance with Company policy.  Peloquin adamantly disagreed.

104.    Peloquin's challenge to Burgers about the termination recommendation, as well as Peloquin's defense of Chow, engendered retaliatory animus in Burgers toward Peloquin.

105.    On or about December 1, 2023, Burgers then called Peloquin into a meeting and told Peloquin that she herself had "performance issues" and, as a consequence, that Peloquin would not be receiving a pay increase during that performance rating period.  But that was absurd; Burgers had already given Peloquin a superb performance rating during that timeframe; a score of 3 out of 5, which Tesla considers "Excellent."

106.    It was retaliatory.  Nothing had changed with respect to Peloquin's job performance; the only thing that had changed was that Peloquin had continued to raise complaints and challenges to Burger's decisions to overrule discipline for validated instances of racism, sexual harassment, and workplace violence in Fremont.

107.    On or about December 6, 2023, Peloquin sent an email to Musk expressing, as had others, her concerns about Burgers' retaliatory conduct.

108.    Five days later, on or about December 11, 2023, Burgers called Peloquin into a meeting and fired her for "poor performance."

109.    Peloquin's termination was pretextual in nature.  Burgers did not truly fire her for poor performance; instead, Burgers fired Peloquin in retaliation for lodging complaints against her.  To be sure, there was nothing wrong with Peloquin's performance at any point during her employment with the Tesla.

Rather, what was actually wrong was Peloquin's desire to do the right thing and continue to rid the Company of the cultural scourge of racism that exists there. Yet, in a misguided effort to "save face" rather than eliminate the blight of racism, Tesla pushed Peloquin out just as it has with others.

110.    Plainly, Peloquin's recommendation that the employee be terminated for racial misconduct engendered in Burgers and her Texas-based counterparts fear and anxiety that yet another instance of racial misconduct would expose Tesla to further liability in the context of the State's lawsuit.  She also feared that it would generally expose the Company to bad press and negative public perception.  And given that Burgers was the overall HR manager for the Fremont facility and responsible for trying to change the culture there, Burgers was fearful and anxious that she would be held responsible for the occurrence of these additional instances of racial misconduct.

111.    Consequently, Burgers' decision to terminate Peloquin's employment was motivated entirely by the retaliatory animus Peloquin's investigation and termination recommendation engendered in Burgers.

112.    And Peloquin's termination was especially astonishing in the context of complaints and concerns she had expressed in the preceding months concerning Tesla's efforts to try to manipulate the number of validated race-based complaints from Fremont employees.

113.    In or about the summer of 2023, in the midst of the State's racial discrimination suit against the Company, as described above, one of Peloquin's HR superiors from Tesla's Texas headquarters named Bert Somsin came to visit the Fremont facility.  During a meeting with Peloquin, Burgers, and other of Peloquin's HR colleagues, Somsin told the group that the number of validated race-based complaints coming out of Fremont was too high.

114.    In raising the issue, Somsin's concern was not borne out of any genuine concern for fixing the racist culture in Fremont, but instead because he

knew that a high number of validated complaints as investigated by the Fremont HR professionals would only further justify bases of the State's discrimination suit against the Company.

115.   Thus, it was in the context of this particular meeting and others that the HR professionals at Fremont were given the directive to try to "re-frame" and "re-characterize" what were plainly race-based circumstances as incidents that were motivated by something—anything—other than race.

116.   Peloquin voiced her disagreement and displeasure with that directive. And she did so directly with Burgers on or about August 30, 2023, when Burgers sent Peloquin a text message asking for her help in figuring out a way to artificially reduce Fremont's validated race-based complaint numbers.  Peloquin offered to help re-examine the complaints and investigative outcomes, but was unwilling to falsely re-characterize those complaints if the facts did not warrant it.

117.   Peloquin's complaints, concerns, and objections on that issue, and others, engendered in Burgers and Somsin retaliatory animus toward her.  They fired Peloquin as a result.

118.   Peloquin was also outspoken about the favorable treatment toward white male employees in Fremont, who often received disciplinary leeway and favoritism that Black and Latino employees did not.  For instance, in or about May 2023, Peloquin complained to Burgers that many white males were not being disciplined in the same way as non-white employees.  One white male employee had two complaints of sexual harassment substantiated against him; yet, Burgers refused to mete out discipline at a level commensurate with that repeated misconduct, even after the employee's behavior continued after being issued a final written warning.

119.   Another white employee had been disciplined for absenteeism as work; he had clocked in, but was then MIA from his duty station and was caught. The incident was a major safety violation given a death that occurred in Tesla's

Shanghai facility when a similar incident occurred. That same employee then
yelled at a supervisor who was trying to give him instruction, which the supervisor
perceived to be a precursor to a forthcoming physical attack. Peloquin's team
placed the employee on unpaid administrative leave pending investigation of the
incident, as is standard Tesla policy and practice. Yet, Burgers changed the leave
status back to "paid, " which was a concession rarely offered to similarly-situated
Black and Latino employees.

**B.     Adam Chow**

120.    Following the wrongful termination of Linda Peloquin, there was no
one left to protect her direct-report—Adam Chow, the HR professional that
investigated and substantiated the "hang by a tree" comment—from Burgers'
retaliation. After Peloquin was pushed out in December 2023, Burgers then also
fired Chow for "poor performance"—following her typical M.O.—just three
months later in March 2024.

121.    Plaintiff Adam Chow is an Asian male. Chow has spent the majority
of his professional career working in Human Resources, having worked in high-
level HR positions for the past 10 years. Chow has worked for a number of
Fortune 500 companies and excelled in each position he has held. Until his
retaliatory termination from Tesla, Chow had never before been fired from a job.

122.    In or about March 2022, Chow began working for Tesla as a "HR
Business Partner." Such was an HR management position for which Chow was
generally responsible for the provision of HR-related services to auto production
employees. Specifically, Chow was assigned to oversee the provision of HR-
related services to production employees for Tesla's passenger vehicles at the
Company's manufacturing plant in Fremont, California.

123.    Chow never had any bonafide discipline or attendance issues during
the course of his employment with Tesla. And he never received any negative
performance reviews or work evaluations. To the contrary, both his superiors and

subordinates consistently praised Chow's work execution and lauded his investigative prowess.  So, too, did the operational colleagues he worked with throughout the Company on various matters and projects.

124.   As above, in or about October 2023, Chow received a complaint from a manufacturing employee named M.P. about a racially-motivated incident that the employee also perceived to be a threat of physical violence.  As M.P. and another employee named M.S. were working on a vehicle, M.P. called out to M.S. to stop him from closing a door and causing damage to the car.  M.S. responded by angrily yelling back, "Do you want to hang by a tree?"  M.P., who is Black, was astounded by what M.S., who is Caucasian, yelled at him.  He understood the comment to be referring the lynching of Black men, so was threatened and offended by it— particularly because of the overall racial tension and toxicity in the Fremont facility.  He reported it to HR and Chow was assigned to investigate the incident.

125.   As a consequence of his investigation, Chow validated that the incident occurred, that it was racially motivated, and that it was physically threatening in nature—all in violation of Tesla's anti-racism  and anti-violence policies.  Among other things, M.S. had texted M.P. a purported apology the next day, thus, admitting that he had made the statement—but then denied during his interview with Chow that he had said anything, not knowing that Chow had already reviewed the text exchange.

126.   Chow recommended that the employee be fired for violating policy and for a lack of candor.  The wrongdoer's operational supervisory chain agreed. So, too, did Peloquin, Chow's direct supervisor withing HR.

127.   Burgers did not agree.  Again, Burgers was fearful that another instance of racism and racially-motivated violence would reflect poorly on her leadership, particularly given the state and federal lawsuits against the Company.

128.   When Peloquin challenged Burgers about her decision to overrule the termination recommendation, Burgers contended that Chow had prior discipline

and performance problems, and that his investigation was not done in accordance with Company policy.

129.    Peloquin adamantly disagreed.  As she should have.  Chow did not have any formal discipline in his file and, in any event, the prior misconduct to which Burgers was an incident in which another employee misconstrued Chow's known physical disability—and for which Chow had already lodged a complaint against Burgers for taking the other employee's side.

130.    Peloquin's challenge to Burgers about Chow's termination recommendation, as well as Peloquin's defense of Chow, engendered retaliatory animus in Burgers and her Texas counterparts toward both Peloquin and Chow.

131.    As above, Burgers ultimately fired Peloquin in retaliation in December 2023.  In February 2023, Burgers intentionally began "papering" Chow's file with pretextual "poor performance" issues.  Burgers gave Chow a performance assessment rating of just 2.5 out of 5, meaning that his performance rating was less than average.  That rating was unjustified and only meted out in retaliation for Chow's prior complaints against Burgers as well as for substantiating the race-based "hang by a tree" threat.

132.    Chow's performance was not poor or failing.  To the contrary, his direct supervisor—Linda Peloquin—believed that Chow was excelling in his role and should have received an "Excellent" rating.

133.    Moreover, Chow had never received such a low rating during the entirety of his tenure at Tesla, which preceded Burgers' arrival in Fremont.

134.    On or about March 8, 2024, Burgers advised Chow that he had two options; one, that he could accept being placed on a "Performance Improvement Plan" (PIP), or, two, that he could accept a severance package and separate from the Company.

135.    Either way, the message was clear:  Burgers wanted Chow out.  And she was papering his file, just as she had done with others before him, to

pretextually justify a "poor performance" termination down the line.

136.   Chow knew that Burgers' criticism of his work performance was groundless and that it would be impossible to survive the PIP because it was designed for failure.  His fate was already sealed.  Accordingly, on or about March 11, 2024, Chow had no choice but to resign from Tesla given the discriminatory and harassing working environment created by the Company.  Chow had been constructively terminated.  No reasonable person would have continued to subject themselves to that kind of retaliation—being subjected to false accusations and suddenly deemed a poor performer when there was no legitimate basis for it.

137.   Chow's termination was also rooted in retaliatory and discriminatory animus relating to his physical disability.  The year prior to the "hang by a tree," in or about December 2022, Chow was encouraged to, and did, accept responsibility for becoming the night shift HR Partner for the entire Fremont facility.  That meant that Chow was solely responsible from 6:00 p.m. to 4:00 a.m. for providing HR guidance at the 24-hour manufacturing facility.  That meant that, at any given time, Chow had over 100 active HR cases, including investigations of race-based incidents and retaliation, as well as Musk-level escalations because of the gravity of the circumstance.

138.   In the Spring of 2023, Chow had an encounter with two employees who were known to repeatedly raise baseless complaints about a myriad of issues at the Fremont plant.  One of those employees was a plant worker named B.R., with whom Chow had been dealing since the beginning of his tenure with Tesla.  B.R. had made over a dozen allegations up to that point, for which Chow did the intake since he was B.R.'s assigned HR partner.

139.   One night in the Spring of 2023, B.R. met with Chow and conveyed the same complaints against management that he had repeatedly articulated to Chow on previous occasions and which Chow had already processed for investigation.  Chow suggested to B.R. that he take the issues up with the assigned

Employee Relations investigator since they already have open cases on the repeated issues.

140.    Following their interaction, B.R. complained to Burgers that Chow had acted unprofessionally during their meeting by constantly rolling his eyes.

141.    In or about May 2023, Burgers issued Chow a disciplinary write-up for the B.R. incident.  But as Burgers well knew, Chow did not roll his eyes at B.R., nor dismiss his concerns.  Rather, as Burgers well knew, Chow suffers from a physical disability that causes involuntary movements of the muscles around his eyes.  So, to the extent B.R. perceived an "eye roll," it was a consequence of Chow's disability.

142.    Consequently, in or about May 2023, Chow filed a complaint against Burgers, contending that the write-up constituted illegal discrimination and retaliation based upon his disability.  Chow escalated his concerns about Burgers' retaliatory writeup to Leah Allen and Jenifer Romero, HR managers within his supervisory chain.

143.    Yet, astoundingly, Burgers was made aware of the complaint.  In or about August 2023, Tesla hired outside legal counsel to conduct an investigation of the Chow's complaint; and when the law firm emailed Chow to set up a meeting regarding his Burgers complaint, the firm copied Burgers on the email.

144.    Chow's complaint engendered retaliatory animus in Burgers toward Chow, and she later fired him for that reason as well.

**C.    Tiara Paulino & Sharnique Martin**

145.    Following the wrongful termination of Linda Peloquin, there was no one left to protect her direct-reports from Burgers' retaliation.  Others on Peloquin's team besides Adam Chow were likewise terrified of suffering the same type of retaliation by Burgers. That included Plaintiffs Sharnique Martin and Tiara Paulino, two HR Business Partners that also worked under Peloquin.  Martin and Paulino had also raised complaints about Burgers' poor leadership, vindictiveness,

and retaliatory personnel actions, so were fearful that Burgers' behavior would continue unless upper management stepped in—including Elon Musk.

146.   It was as if no one was safe and that Burgers could act with complete impunity.  As a HR Manager, Peloquin was essentially Burgers' supervisory peer within Fremont's HR hierarchical chain.  So, many thought that if it were so easy to fire Peloquin—and for reasons that were plainly retaliatory—then they, too, could be fired at the whim of Burgers and her Texas counterparts.

147.   Martin began working for Tesla as an "HR Business Partner" on or about June 13, 2022.  Paulino took the same position on or about June 27, 2022.  Neither Martin nor Paulino received any corrective actions during the course of their employment with Tesla.  Neither was ever written up.  Neither was ever formally or informally disciplined.  Neither ever had any attendance issues.  And neither ever received any negative performance reviews or work evaluations.  To the contrary, both their superiors and colleagues consistently praised Martin's and Paulino's work execution and lauded their HR prowess.  So, too, did the operational and HR colleagues they worked with throughout the Company on various matters and projects.

148.   After firing Peloquin on December 11, 2023, Burgers held a virtual Teams meeting with Peloquin's direct-reports, Martin and Paulino among them, to inform them about the termination.  Burgers could not provide any intelligible basis or context for Peloquin's termination during the meeting because, of course, it was rooted entirely in retaliatory animus.

149.   On or about December 13, 2023, in the immediate wake of Peloquin's termination, Martin and Paulino sent an email to high-ranking managing agents at Fremont, including the HR Director and Manufacturing Director.  Among the individuals copied on Martin's and Paulino's email were Allie Arebalo, Tom Zhu, and Hrushikesh Sagar.

150.   Martin's and Paulino's email described, among other things, the

extraordinarily high attrition rate amongst HR professionals in Fremont, the lack of leadership by Burgers, and Burgers' retaliatory misconduct toward HR professionals that spoke up and complained about those issues.

151.   Fearful of retaliation from Burgers, Martin and Paulino did not include her on the email.

152.   Regardless, the email engendered retaliatory animus in those management officials that did receive it toward Martin and Paulino—in Allie Arebalo, in particular—who were aligned with Burgers and were likewise motivated to suppress new allegations of discrimination and retaliation given the pending litigation against the Company.

153.   Moreover, the individuals that were copied on the email—Arebalo, in particular—forwarded the email to Burgers and discussed it with her, which engendered further retaliatory animus in Burgers toward Martin and Paulino.  They were both fired within five weeks of sending that email, in retaliation for sending it in the first place.

154.   Initially, Arebalo responded to the email and facilitated virtual interviews for Martin and Paulino to express their concerns.  In or about December 2023, Martin and Paulino each met with Jenifer Romero, Senior HR Manager, to discuss the concerns raised in their email, including Burgers' plainly retaliatory termination of Peloquin and others.

155.   Both Martin and Paulino could discern from their discussions with Romero that she had spoken with Burgers, and had described the contents of their email and identified them as the authors.  Martin and Paulino began to appreciate then that they, too, would likely have targets on their backs.

156.   Thereafter, Martin undertook to move out of the HR Department and into a different role within the Company outside of Burgers' chain of command. In or about January 2024, after six successful interviews with individuals on the team, Martin was offered and accepted a non-HR position within a  manufacturing

operations group.

157.    Martin's first day in her new role was on or about February 12, 2024. Yet, Martin was fired just two days later on February 16, 2024.  When she asked why, Martin was told by the manager that fired her that "her role was no longer critical."

158.    But that was untrue.  That Manufacturing Operations Manager—who himself became the subject of a retaliatory demotion—shared with Martin that he was pressured by the HR Department to "re-characterize" her role as non-critical so that Martin could be terminated.

159.    That Manufacturing Operations Manager also shared with Martin that the HR Department was blaming she and Paulino for authoring an anonymous "open letter" to the Fremont Factory that was critical of management and encouraged unionizing at the Fremont facility.  Neither Martin nor Paulino authored that letter, either offered any input for the letter, nor has either ever even seen it.  The manager shared with Martin that there was no genuine investigation of who authored the letter, because Arebalo and Burgers were keen to blame it on Martin and Paulino as a pretextual basis to terminate their employment.

160.    Paulino was fired the day before Martin, on or about February 15, 2024.  That day, Martin was summoned to a conference room at the Fremont facility by Burgers and informed that her employment was terminated for "poor performance."  Leah Allen, the "HR-for-HR" Manager at Tesla's Texas headquarters, was also present via video.

161.    As with the others fired by Burgers, the "poor performance" reasoning was pretextual.

162.    Paulino had never during her tenure with Tesla received any form of performance coaching, warning, or negative feedback.  To the contrary, she repeatedly received written praise from the peers and operations leaders with whom she worked.  Moreover, Paulino had just been promoted six months earlier,

on about August 7, 2023.  Furthermore, Paulino had already been informed by Peloquin—to whom she directly reported prior to Peloquin's firing—that Peloquin had given Paulino an "Excellent" performance rating during the most recent assessment cycle.

**D.    Gregory Vass**

163.   Ironically, Tesla is an equal opportunity discriminator.  Not only does the Company discriminate on the basis of race and gender and retaliates against employees that lodge complaints, but the Company also discriminates on the basis of sexuality.  Plaintiff Gregory Vass, a former Tesla employee who is gay, was fired in March 2024 after complaining that Nicole Burgers had unilaterally placed him in a LGBTQ affinity group for Tesla employees without his permission or consent.

164.   Although Vass is by no means ashamed of his sexuality, the way in which Vass decides to exhibit his sexuality—particularly in the workplace—is an agency that he wished to control, not his HR manager. Vass was aware that Burgers was retaliatory and vindictive against those that voiced complaints and objections about her decisions, so he instead went to the designated "HR-for-HR" Manager, Leah Allen, whose role was to help remediate those types of issues for Tesla HR professionals.  Still, Allen was aligned with Burgers, shared Vass' concerns with her and, consequently, that criticism engendered in Burgers retaliatory animus toward Vass.  Burgers then greenlit an investigation against Vass, as she had done with others, and directed his supervisor to terminate his employment less than six months later.

165.   Vass began working with Tesla as "HR Business Partner" in or about June 2022.

166.   Vass never had any bonafide discipline or attendance issues during the course of his employment with Tesla.  And he never received any negative performance reviews or work evaluations.  To the contrary, both his superiors and

subordinates consistently praised Vass' work execution and lauded his investigative prowess.  So, too, did the operational colleagues he worked with throughout the Company on various matters and projects.

167.   In or about June 2023, Nicole Burgers advised Vass that she was placing him in a "Pride Group."  Vass had not asked to be placed in this group, nor was he aware of any other HR professionals being asked if they wanted to support whatever the mission of the Pride Group was.  Burgers advised Vass that one of the group's initial projects was to create a slide deck with facts about the LGBTQ community that would be played in the cafeteria to help raise awareness and educate employees.

168.   Vass was profoundly uncomfortable with being unilaterally placed in the Pride Goup since it appeared to him that he was only singled out to be a part of the group because of his sexuality. Vass expressed those concerns to his coworkers at the time.

169.   In or about October 2023, Vass had a meeting with Leah Allen, the designated "HR -or-HR" Manager that physically sat in Tesla's Texas headquarters.  During that meeting, Vass articulated his concerns and complaints about being unilaterally placed in the Pride Group without any prior consultation or consent, and expressed his belief that he was singled out to be a part of the group because of his sexuality.  Vass explained that, to his knowledge, all of the other members of the group were also members of the LGBTQ community, and that they were likewise uncomfortable being forced into a public grouping solely based on their sexuality.  Following the meeting, Vass sent Allen screenshots of Burgers' emails relating to the group and awaited her follow-up, which never came.

170.   Thereafter, Vass continued to excel as a member of the HR team.  He was even moved into the role of "Employee Relations Partner," a specialty position within HR that is responsible for conducting investigations into allegations of

discrimination and harassment based upon protected class, prior complaints, romantic conflicts of interest, and abuse of power allegations against senior managers, among other things.  The scope of Vass' work also increased, as he began conducting investigations across all of Tesla's North American sites, not just in Fremont.

171.   As was the case with others, though, that exceptional performance did not matter. The only thing that mattered was the fact that Vass had complained about Burgers.

172.   Because Allen was aligned with Burgers, rather than holding Vass' complaints in confidence, she immediately shared them with Burgers—which, of course, engendered retaliatory animus in Burgers toward Vass.

173.   Consequently, in March 2024, Burgers and Allen opened an investigation against Vass for allegedly improperly viewing certain employees' salary records, despite the fact that that was part of his fundamental job duties.  Vass was placed on administrative leave pending that investigation, but already knew what the outcome would be.  On March 22, 2024, his direct supervisor called Vass and informed him that his Tesla employment was terminated.

**E.    Ozell Murray**

174.   By all accounts, not only is Tesla a racist and toxic place to work in terms of its Company culture, but it is a physically unsafe place to work as well. Plaintiff Ozell Murray began working for Tesla in September 2018, having taken a job as a "Protective Operations Specialist" with the physical security team responsible for safety and order at the Fremont facility.

175.   Murray has an extensive background in law enforcement, having worked as a sworn peace officer for a number of different police departments.  At the time Murray accepted the position with Tesla, he had a 5-year background in law enforcement and, as well, a 4-year background in corporate security.

176.   Murray excelled at all times during his Tesla employment, having been promoted more than five times during his six-year tenure with the Company.  At the time of his constructive termination from the Company, Murray was in the role of "Senior Manager of Physical Security Operations" and, thus, generally responsible for managing the overall security apparatus at the 22,000-person Fremont facility.

177.   And, indeed, the Fremont plant certainly needed Murray and his team of 120 direct reports to help ensure the safety and security of the workers and workplace there.  Murray and his team routinely:

- broke up physical fights between employees;
- recovered drugs and drug paraphernalia, including cocaine and fentanyl;
- pulled employees off the manufacturing line and sent them home for being alcohol-intoxicated and high on drugs;
- confiscated guns discovered on the premises; and
- responded to and investigated sexual assaults on employee shuttle buses.

178.  In fact, in December 2021, one employee was even shot dead at the Fremont plant.  Thereafter, Murray met with Musk to discuss how to make the plant safer with bag searches, metal detectors, and the like.

179.  Like the other Plaintiffs, Murray never received any Bonafide corrective actions during his tenure with Tesla.  He was never written up.  He was never formally or informally disciplined.  He never had any attendance issues. And he never received any negative performance reviews or work evaluations.  To the contrary, both his superiors and subordinates consistently praised Murray's work execution and lauded his management prowess.  So, too, did the operational and HR colleagues he worked with throughout the Company on various matters and projects.

180.  Still, during his tenure with Tesla, Murray was outspoken with his superiors as well as with Fremont's HR managers, including with Nicole Burgers, about many of the policy-based issues that he believed were fostering the lack of safety and security in Fremont.  That, of course, engendered in those officials the retaliatory animus that ultimately led to Murray's termination.

181.  Among other things prior to his termination, Murray spoke out about:

- An incident in September 2023, when several HR employees were caught by one of Murray's security personnel drinking alcohol on the Fremont property which, according to express Tesla policy warranted immediate suspension no matter the employee's position.  In September 2023, Murray complained to his supervisors and HR counterparts that the offending employees were allowed to return to work whereas others who had committed the same type of violation were not.

- In or about March 2023, Murray was outspoken about a policy that he believed supervisors and managers were abusing as a means of retaliating against line employees.  At the time, Tesla had a "zero tolerance" policy with respect to drug and alcohol impairment while working.  Under the policy, if a supervisor or manager suspected that a worker was under the influence, that manager could simply report that belief to security and someone from Murray's team would then escort the worker off the premises without question.  However, there were many instances in which Murray's team responded to such calls and could not perceive or discern that the individual reported by the manager was, in fact, under the influence.  As it turned out, many supervisors and managers were merely using the policy as a means to retaliate against their subordinates—and, in particular, when a line

employee had turned down the supervisor or manager's sexual advances.  Or, when the manager or supervisor wanted to retaliate against someone because of their race or ethnicity.  Or, when the manager or supervisor wanted to retaliate against someone because of a complaint an employee had lodged against them.  Yet, because of the policy was written, there was no means for Murray's security personnel to challenge the veracity of manager's allegation; they had to walk to the person out regardless.  In or about March 2023, Murray voiced his objections to his superiors as well as to his HR counterparts about this concerns that the policy was being abused—particularly as against Black and Latino employees.

. In or about December 2022, Murray was outspoken about his objections to Nicole Burgers' requests, as described above, to effectively "perp walk" the HR employees that she had terminated. Based upon his professional training and experience, Murray's custom and practice was to only have security personnel escort off the premises high-risk individuals that might be violent or mentally-unstable or who might steal something from the property. None of the HR professionals that Burgers was requesting be escorted out met that criterion and Murray believed it was an unnecessary act of retribution on Burgers' part.

. In or about January 2022, Murray was also outspoken with his direct supervisor, Ray Sethna, the overall Senior Director of Global Security Operations, after Sethna gave Murray what he perceived to be racially insensitive and insulting direction with respect to new Black would-be hires in Security Department.  As above, the use of the "N-word" was prevalent throughout the

46

Fremont facility.  A few months prior, one of Murray's direct-reports, a female security officer who was also a former police officer, was victimized when a Tesla employee called her a nigger. Murray's colleague was so distressed by the incident and the impunity with which the word was used toward her and around the Fremont facility that she had to take a medical leave from work to recover from the trauma.  Yet, instead of offering encouragement, Murray's supervisor, Sethna, counseled him that Murray should be informing all new Black security personnel that the use of the "N-word" was simply engrained in the culture at Tesla and, so, Murray should only be bringing aboard that are willing to accept and acquiesce to the prevalence of that word in the workplace.

Each of these instances, both singularly and collectively, engendered in Murray's supervisors as well as their HR counterparts discriminatory and retaliatory animus against him.

182.    Thus, when Murray was injured on the job in or about April 2024, his managers and supervisors used that circumstance as an opportunity to push him out.

183.    Murray suffered an on-the-job injury in or about April 2024 after being attacked by a Tesla employee as he tried to intervene in an altercation between that employee and another.  Murray underwent surgery on a knee injured during that attack and ultimately returned to work in or about June 2024 in a physician-approved "light duty" capacity that did not substantially impair his ability to perform the essential functions of his job.

184.    The fact that Murray took medical leave in the first place as a consequence of his workplace injury and, as well, the fact that he returned to work in a "light-duty" status engendered disability-based discriminatory and retaliatory animus in his supervisors and their HR counterparts toward him.  In or about June

2024, just weeks after Murray's return to work, he was notified that he was "under investigation" and would need to sit for an interview.

185.    That, too, was the modus operandi of the HR Department when they wanted to "paper" someone's file and ultimately push them out the door.  They would identify some petty and inconsequential incident, and then open an investigation with the goal of substantiating a Company policy violation of upon which they could predicate discipline and termination.  And the HR Department would reach back however far back in time they needed in order to manufacture what they needed.

186.    Such was the case with Murray.  Murray was notified that he was the subject of an investigation relating to a two-year-old incident in which he purportedly said something inappropriate to some unidentified person.  The accusation was false and nonsensical.  The incident did not even occur at a Tesla-sponsored event nor did it even occur on Tesla property.  Nor was the purported inappropriate comment even alleged to have been made toward a Tesla employee.  But Murray had seen this tactic play out with other employees in the past, so understood the message Tesla was sending him:  they wanted him gone.

187.    Murray confronted his manager, Sethna, about the investigation and convey his belief that it was retaliatory—but that accusation, of course, only further engendered retaliatory animus in Sethna toward Murray.

188.    In August 2024, Murray's Tesla superiors and their HR counterparts then forced him onto an unwarranted and unsubstantiated "stress leave" as a pretextual means of justifying Murray's inability to work.

189.    The stress leave decision was pretextual.  There was not actually any legitimate problem with Murray's work performance.  Rather, Murray's superiors and their HR counterparts simply wanted to begin to artificially document and "paper" his file with baseless performance issues so that they could justify Murray's eventual termination.  The forced leave was entirely driven by the

discriminatory and retaliatory animus harbored by Murray's managers against him on account of Murray's prior complaints and temporary disability, not because of her work performance.

190.    Accordingly, on or about September 12, 2024, Murray had no choice but to resign from Tesla given the discriminatory and harassing working environment created by the Company.  Murray had been constructively terminated. No reasonable person would have continued to subject themselves to that kind of retaliation—being subjected to false accusations and placed "under investigation" designed to vex and harass them, being suddenly deemed a poor performer, and being forced onto a completely unwarranted Company-imposed "stress leave" when there was no medical basis for it.

## V.
## CAUSES OF ACTION

### First Cause of Action

### Retaliation

### In Violation of Cal. Gov. Code § 12940(h)

### (All Plaintiffs as Against All Defendants)

191.    Plaintiff incorporates by reference each of every of the paragraphs above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

192.    Section 12940(h) of the California Government Code makes it unlawful for an employer to retaliate against an employee for "oppos[ing] practices forbidden under [FEHA's statutory scheme] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA's statutory scheme]."

193.   As described in the preceding paragraphs of this Complaint, on multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff engaged in such protected conduct under FEHA by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (*see*, *supra*, at Sect. IV):  voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees on protected medical leave or otherwise employees with permanent and temporary physical disabilities; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees from racial minorities, namely, Black and Latino employees; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, female employees by male employees on account of that gender difference; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, homosexual employees.

194.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which Plaintiff voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

195. On multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

196. In response, Defendant retaliated against Plaintiff, including, but not limited to: harassing and hassling Plaintiff both during and outside of normal work hours; unreasonably and unjustifiably increasing Plaintiff's workload; unreasonably and unjustifiably criticizing the speed with which Plaintiff was completing assignments; unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; questioning and criticizing Plaintiff for taking sick and disability leave; forcing Plaintiff to take medical and/or administrative leave; offering and/or placing Plaintiff onto a sham, last-chance Performance Improvement Plan; and, terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint (*see, supra, at Sect. IV*)).

197. Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment. In other words, Defendant fired Plaintiff because of Plaintiff's protected activities. But for Plaintiff's protected activities, Plaintiff would not have been terminated. Plaintiff's protected activities were the sole, motivating, and but-for cause of the adverse employment actions Defendants took against Plaintiff.

198. The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions,

and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

199.    Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

200.    Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the true motivating bases of the adverse employment actions to which Plaintiff was subjected.

201.    Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna each personally participated in the effort to undertake the foregoing actions as against Plaintiff.  They each engaged in such conduct for personal gratification because of meanness or bigotry and for other personal motives.

202.    The actions of Plaintiff's managers, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in a wrongful and illegal termination.

203.    The actions of Plaintiff's managers, as well as those of their agents and subordinates, created a work environment that was so intolerable that a reasonable person in Plaintiff's position would have had no reasonable alternative except to resign.

204.    To the extent Plaintiff "resigned," such was because of the actions of

Plaintiff's managers, as well as those of their agents and subordinates; Plaintiff was harmed by the loss of their employment, Company stock equity, and medical benefits package; and the actions of Plaintiff's managers were a substantial factor in causing Plaintiff's harm.

205.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

206.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

207.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

208.   Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 12965(b) of the California Government Code.

## **Second Cause of Action**

### **Retaliation**

### **In Violation of Cal. Labor Code § 1102.5(b)**

### **(Against the City of Los Angeles and Does 1-10)**

209.   Plaintiff incorporates by reference each of every of the paragraphs above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

210.   Section 1102.5(b) of the California Labor Code makes it unlawful for an employer to retaliate against an employee for "disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . of state or federal statute . . . or regulation, regardless of whether disclosing the information is part of the employee's job duties."

211.   As described in the preceding paragraphs of this Complaint, on multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff engaged in such protected conduct under section 1102.5 by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV):  voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees on protected medical leave or otherwise employees with permanent and temporary physical disabilities; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees from racial minorities, namely, Black and Latino employees; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and

intimidation of, female employees by male employees on account of that gender difference; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, homosexual employees.

212.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which Plaintiff voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

213.   On multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

214.   In response, Defendant retaliated against Plaintiff, including, but not limited to:  harassing and hassling Plaintiff both during and outside of normal work hours; unreasonably and unjustifiably increasing Plaintiff's workload; unreasonably and unjustifiably criticizing the speed with which Plaintiff was completing assignments; unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; questioning and criticizing

Plaintiff for taking sick and disability leave; forcing Plaintiff to take medical and/or administrative leave; offering and/or placing Plaintiff onto a sham, last-chance Performance Improvement Plan; and, terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint (*see, supra, at Sect. IV*)).

215.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.  In other words, Defendant fired Plaintiff because of Plaintiff's protected activities.  But for Plaintiff's protected activities, Plaintiff would not have been terminated.   Plaintiff's protected activities were the sole, motivating, and but-for cause of the adverse employment actions Defendants took against Plaintiff.

216.   The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

217.   Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

218.   Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to

disguise the true motivating bases of the adverse employment actions to which Plaintiff was subjected.

219.   Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna each personally participated in the effort to undertake the foregoing actions as against Plaintiff.  They each engaged in such conduct for personal gratification because of meanness or bigotry and for other personal motives.

220.   The actions of Plaintiff's managers, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in a wrongful and illegal termination.

221.   The actions of Plaintiff's managers, as well as those of their agents and subordinates, created a work environment that was so intolerable that a reasonable person in Plaintiff's position would have had no reasonable alternative except to resign.

222.   To the extent Plaintiff "resigned," such was because of the actions of Plaintiff's managers, as well as those of their agents and subordinates; Plaintiff was harmed by the loss of their employment, Company stock equity, and medical benefits package; and the actions of Plaintiff's managers were a substantial factor in causing Plaintiff's harm.

223.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

224.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a

conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

225.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

226.   Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 1102.5(f) of the California Labor Code.

### Third Cause of Action

**Disability Discrimination**

**In Violation of Cal. Gov. Code § 12940(a),(h, (j)**

**(Plaintiffs Adam Chow and Ozell Murray as Against All Defendants)**

227.   Plaintiff incorporates by reference each of every of the paragraphs above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

228.   Section 12940, subsections (a), (h), and (j), of the California Government Code make it unlawful for an employer to discriminate against and harass an employee because of "physical disability, mental disability, medical condition," or on account of the employee's other protected immutable characteristics.  Section 12940(h) of the California Government Code makes it unlawful for an employer to harass an employee for "oppos[ing] practices

forbidden under [FEHA's statutory scheme] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA's statutory scheme]."

229.  As described in the preceding paragraphs of this Complaint, Plaintiff Adam Chow engaged in such protected conduct under FEHA by disclosing his congenital eye condition and physical disability (as described in the preceding paragraphs of this Complaint (*see, supra, at Sect. IV*)).

230.  As described in the preceding paragraphs of this Complaint, Plaintiff Ozell Murray engaged in such protected conduct under FEHA by disclosing his temporary total-disabling knee injury, resulting knee injury, and resulting physician-approved light-duty return-to-work status (as described in the preceding paragraphs of this Complaint (*see, supra, at Sect. IV*)).

231.  At all times material to the allegations of this Complaint, Tesla was aware that Plaintiff was a person with a physician-diagnosed and physician-documented medical condition and, thus, aware that Plaintiff was a protected person on account of such "physical disability, mental disability, medical condition" and immutable characteristics within the meaning of state and federal law.

232.  At all times material to the allegations of this Complaint, Tesla was aware that Plaintiff had sought, or was seeking, medical treatment because of Plaintiff's disability.  Tesla was also aware that Plaintiffs managers, coworkers, and colleagues could visibility perceive Plaintiff's disability without Plaintiff having to disclose the same; Plaintiff's disability was open, obvious, and immutable during Plaintiff's employment with the Company.

233.  At all times material to the allegations of this Complaint, Plaintiff's Tesla managers, as well as those managers' agents and subordinates, personally singled Plaintiff out for harassment and disparate treatment with regard to the terms, conditions, and privileges of Plaintiff's employment because of Plaintiff's

medical condition and disability in violation of Sections 12940 and 12945 of the California Government Code.

234.   Plaintiff's protected activities and characteristics—namely, Plaintiff's physical disability and medical condition, and attendant need for medical leave—were individually and collectively a contributing factor in Defendant's decision to terminate Plaintiff's employment and, prior thereto, to subject Plaintiff to abusive and harassing retaliatory employment practices.  Plaintiff's protected activities were the sole, motivating, and but-for cause of the adverse employment actions Defendants took against Plaintiff.

235.   In response to Plaintiff's protected activities and characteristics—namely, Plaintiff's physical disability and medical condition, and attendant need for medical leave —the Company discriminated against Plaintiff, including, but not limited to:  harassing and hassling Plaintiff both during and outside of normal work hours; unreasonably and unjustifiably increasing Plaintiff's workload; unreasonably and unjustifiably criticizing the speed with which Plaintiff was completing assignments; unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; questioning and criticizing Plaintiff for taking sick and disability leave; forcing Plaintiff to take medical and/or administrative leave; offering and/or placing Plaintiff onto a sham, last-chance Performance Improvement Plan; and, terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint (*see, supra, at Sect. IV*)).

236.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.  In other words, Defendant fired Plaintiff because of Plaintiff's protected activities.  But for Plaintiff's protected activities, Plaintiff would not have been terminated.   Plaintiff's protected activities were the sole, motivating, and but-for cause of the adverse employment actions Defendants

took against Plaintiff.

237.    The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

238.    Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

239.    Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the true motivating bases of the adverse employment actions to which Plaintiff was subjected.

240.    Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna each personally participated in the effort to undertake the foregoing actions as against Plaintiff.  They each engaged in such conduct for personal gratification because of meanness or bigotry and for other personal motives.

241.    The actions of Plaintiff's managers, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in a wrongful and illegal termination.

242.    The actions of Plaintiff's managers, as well as those of their agents and subordinates, created a work environment that was so intolerable that a

reasonable person in Plaintiff's position would have had no reasonable alternative except to resign.

243.   To the extent Plaintiff "resigned," such was because of the actions of Plaintiff's managers, as well as those their agents and subordinates; Plaintiff was harmed by the loss of their employment, Company stock equity, and medical benefits package; and the actions of Plaintiff's managers were a substantial factor in causing Plaintiff's harm.

244.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

245.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

246.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

247.   Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 12965(b) of the California Government Code.

## **Fourth Cause of Action**

### **Wrongful Termination in Violation of Public Policy**
### **(All Plaintiffs as Against All Defendants)**

248.   Plaintiff incorporates by reference each of every of the paragraphs above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

249.   The discharge of an employee in retaliation for resisting or complaining about employer violations of laws that secure important public policies contravenes those policies, and gives rise to a common law action in tort.

250.   As described in the preceding paragraphs of this Complaint, on multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff engaged in such protected conduct under FEHA and section 1102.5 by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV):  voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees on protected medical leave or otherwise employees with permanent and temporary physical disabilities; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees from racial minorities, namely, Black and Latino employees; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, female employees by male employees on

account of that gender difference; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, homosexual employees.

251.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which Plaintiff voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

252.   On multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

253.   In response, Defendant retaliated against Plaintiff, including, but not limited to:  harassing and hassling Plaintiff both during and outside of normal work hours; unreasonably and unjustifiably increasing Plaintiff's workload; unreasonably and unjustifiably criticizing the speed with which Plaintiff was completing assignments; unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; questioning and criticizing Plaintiff for taking sick and disability leave; forcing Plaintiff to take medical

and/or administrative leave; offering and/or placing Plaintiff onto a sham, last-chance Performance Improvement Plan; and, terminating Plaintiff's employment (as described in the preceding paragraphs of this Complaint (*see, supra, at Sect. IV*)).

254.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.  In other words, Defendant fired Plaintiff because of Plaintiff's protected activities.  But for Plaintiff's protected activities, Plaintiff would not have been terminated.   Plaintiff's protected activities were the sole, motivating, and but-for cause of the adverse employment actions Defendants took against Plaintiff.

255.   The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

256.   Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

257.   Defendant's violation of Plaintiff's statutory and constitutional rights is inconsistent with, and hostile to, the public's interest in correcting violations of state and federal laws and regulations, particularly with respect to protecting the

workplace rights of permanently-disabled and temporarily-disabled individuals and ensuring their ability to work and to meaningfully contribute to society and the economy, and has a chilling effect on other disabled individuals who might wish to participate in the workforce.

258.    Defendant's violation of Plaintiff's statutory and constitutional rights is inconsistent with, and hostile to, the public's interest in correcting violations of state and federal laws and regulations, particularly with respect to protecting the workplace rights of racial and ethnic minorities, and of permanently-disabled and temporarily-disabled workers, and of female-identifying individuals, and of LGBTQ-identifying individuals, and ensuring their ability to work and to meaningfully contribute to society and the economy, and has a chilling effect on other such minorities and individuals who might wish to participate in the workforce.

259.    Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the true motivating bases of the adverse employment actions to which Plaintiff was subjected.

260.    Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna each personally participated in the effort to undertake the foregoing actions as against Plaintiff.  They each engaged in such conduct for personal gratification because of meanness or bigotry and for other personal motives.

261.    The actions of Plaintiff's managers, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in a wrongful and illegal termination.

262.    The actions of Plaintiff's managers, as well as those of their agents and subordinates, created a work environment that was so intolerable that a reasonable person in Plaintiff's position would have had no reasonable alternative except to resign.

263.   To the extent Plaintiff "resigned," such was because of the actions of Plaintiff's managers, as well as those of their agents and subordinates; Plaintiff was harmed by the loss of their employment, Company stock equity, and medical benefits package; and the actions of Plaintiff's managers were a substantial factor in causing Plaintiff's harm.

264.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

265.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

266.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

**<u>Fifth Cause of Action</u>**

**Failure to Prevent Unlawful Discrimination**

**In Violation of Cal. Gov. Code § 12940(k)**

**(Against All Defendants)**

267.   Plaintiff incorporates by reference each of every of the paragraphs above, and repeats, reiterates, and realleges each and every allegation contained therein with the same force and effect as if such paragraphs were set forth fully at length here.

268.   Section 12940(k) of the California Government Code makes it unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

269.   As described in the preceding paragraphs of this Complaint, on multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff engaged in such protected conduct under FEHA by complaining to and about Defendant's conduct.  In particular, Plaintiff's protected activity included, but is not limited to that which was described in the preceding paragraphs of this Complaint (see, supra, at Sect. IV):  voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees on protected medical leave or otherwise employees with permanent and temporary physical disabilities; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, employees from racial minorities, namely, Black and Latino employees; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation of, female employees by male employees on account of that gender difference; and/or voicing concerns, objections, and complaints about the discrimination and retaliation against, as well as the harassment and intimidation

of, homosexual employees.

270.   At all times material to the allegations of this Complaint in which Plaintiff engaged in such protected activities, Plaintiff maintained a good faith and reasonable belief that it was a violation of state and federal law for Defendant to engage in the conduct about which Plaintiff voiced concerns, objections, and complaints.  In particular, Plaintiff maintained a good faith and reasonable belief that Defendant's conduct violated the provisions of the FMLA, California's FEHA, and other statutory laws protective of employees on medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

271.   On multiple occasions on the particular dates and during the date-ranges set forth above, and continuing until Plaintiff's termination from the Company, Plaintiff refused to participate in Defendant's illegal, discriminatory, retaliatory, immoral, and fraudulent activities, including without limitation, the harassment and intimidation of, retaliation against, and wrongful termination of employees on protected medical leave, disability leave, and prohibitive of harassment, discrimination, and retaliation based upon employees' protected characteristics such as race, ethnicity, gender, disability, and sexuality.

272.   In response, Defendant retaliated against Plaintiff, including, but not limited to:  harassing and hassling Plaintiff both during and outside of normal work hours; unreasonably and unjustifiably increasing Plaintiff's workload; unreasonably and unjustifiably criticizing the speed with which Plaintiff was completing assignments; unreasonably and unjustifiably criticizing the quality of Plaintiff's work product and general job execution; questioning and criticizing Plaintiff for taking sick and disability leave; forcing Plaintiff to take medical and/or administrative leave; offering and/or placing Plaintiff onto a sham, last-chance Performance Improvement Plan; and, terminating Plaintiff's employment

(as described in the preceding paragraphs of this Complaint (*see, supra, at Sect. IV*).)

273.   Plaintiff's protected activities, as set forth herein, were individually and collectively a substantial motivating reason in Defendant's decision to terminate Plaintiff's employment.  In other words, Defendant fired Plaintiff because of Plaintiff's protected activities.  But for Plaintiff's protected activities, Plaintiff would not have been terminated.   Plaintiff's protected activities were the sole, motivating, and but-for cause of the adverse employment actions Defendants took against Plaintiff.

274.   The actions of Plaintiff's Tesla managers, as identified herein, as well as those of their agents and subordinates, negatively affected the terms, conditions, and privileges of Plaintiff's employment, ultimately resulting in Plaintiff's wrongful and illegal termination.

275.   Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Plaintiff was treated; they were treated more favorably.  Thus, Plaintiff's Tesla managers, as identified herein, as well as their agents and subordinates, personally singled Plaintiff out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Plaintiff's employment, ultimately culminating in wrongful termination, because of Plaintiff's protected activities as described herein.

276.   Defendant's reasons for harassing Plaintiff and subsequently terminating Plaintiff's employment are pretextual in nature and calculated to disguise the true motivating bases of the adverse employment actions to which Plaintiff was subjected.

277.   Defendant failed to take reasonable steps necessary to prevent the

discrimination and retaliation that Plaintiff was subjected to from occurring, namely, by among other things:  failing to educate, inform, and train its employees; failing to have a robust and effective internal reporting process for such violations; and failing to promptly and thoroughly investigate such violations.

278.   As a direct, foreseeable, and proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered, and will continue to suffer, actual, consequential, and incidental financial losses, including, without limitation, loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in Plaintiff's field and damage to Plaintiff's professional reputation, humiliation, embarrassment, mental and emotional distress and discomfort all in an amount according to proof at the time of trial.

279.   Plaintiff is informed and believes, and on that basis alleges, that the aforesaid acts directed toward Plaintiff by Defendants were carried out with a conscious disregard of Plaintiff's right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to section 3294 of the California Civil Code, among other provisions, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants.

280.   The actions alleged herein were taken by managing agents and/or officers of Defendant and/or ratified by managing agents and/or officers of Defendant, namely, Nicole Burgers, Leah Allen, Allie Arebalo, Bert Somsin, and/or Ray Sethna.  In so doing, said managing agents and/or officers of Defendant acted with oppression and malice as those terms are used in section 3294 of the California Civil Code.  As such, Plaintiff is entitled to an award of punitive damages.

281.   Plaintiff is also entitled to an award of attorneys' and experts' fees pursuant to, inter alia, section 12965(b) of the California Government Code.

# JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial to resolve each and every one of the claims averred in this Complaint against each and every Defendant.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as to each of the Causes of Action set forth herein, for each such category of damages set forth therein, only to the extent provided by law, according to proof, as follows:

**On the First Cause of Action for Retaliation (Cal. Gov. Code § 12940(a),(h)):**

1.  For actual and money damages in an amount according to proof at trial;
2.  For compensatory and emotional distress damages;
3.  For punitive and exemplary damages
    (only to the extent provided by law);
4.  For Plaintiff's reasonable attorneys' fees
    (only to the extent provided by law);
5.  For Plaintiff's reasonable experts' fees
    (only to the extent provided by law);
6.  For an award of prejudgment interest;
7.  For such other relief as the Court deems just and proper.

**On the Second Cause of Action for Retaliation (Cal. Labor Code § 1102.5(b)):**

1.  For actual and money damages in an amount according to proof at trial;
2.  For compensatory and emotional distress damages;
3.  For punitive and exemplary damages
    (only to the extent provided by law);
4.  For Plaintiff's reasonable attorneys' fees
    (only to the extent provided by law);

5.   For Plaintiff's reasonable experts' fees

(only to the extent provided by law);

6.   For an award of prejudgment interest;

7.   For such other relief as the Court deems just and proper.

**On the Third Cause of Action for Disability Discrimination (Cal. Gov. Code § 12940(a),(h)):**

1.   For actual and money damages;

2.   For compensatory and emotional distress damages;

3.   For punitive and exemplary damages

(only to the extent provided by law);

4.   For Plaintiff's reasonable attorneys' fees

(only to the extent provided by law);

5.   For Plaintiff's reasonable experts' fees

(only to the extent provided by law);

6.   For an award of prejudgment interest;

7.   For such other relief as the Court deems just and proper.

**On the Fourth Cause for Wrongful Termination in Violation of Public Policy**

1.   For actual and money damages in an amount according to proof at trial;

2.   For compensatory and emotional distress damages;

3.   For punitive and exemplary damages

(only to the extent provided by law);

4.   For Plaintiff's reasonable attorneys' fees

(only to the extent provided by law);

5.   For Plaintiff's reasonable experts' fees

(only to the extent provided by law);

6.   For an award of prejudgment interest;

7.      For such other relief as the Court deems just and proper.

**On the Fifth Cause of Action for Failure to Prevent Discrimination and Harassment (Cal. Gov. Code § 12940(k)):**

1.      For actual and money damages in an amount according to proof at trial;

2.      For compensatory and emotional distress damages;

3.      For punitive and exemplary damages
        (only to the extent provided by law);

4.      For Plaintiff's reasonable attorneys' fees
        (only to the extent provided by law);

5.      For Plaintiff's reasonable experts' fees
        (only to the extent provided by law);

6.      For an award of prejudgment interest;

7.      For such other relief as the Court deems just and proper.

Dated:  August 7, 2025              DOUGLAS / HICKS LAW APC
                                    Carl E. Douglas
                                    Jamon R. Hicks

                                    /s/ Terrence M. Jones
                                    _____

                                    Attorneys for Plaintiffs LINDA
                                    PELOQUIN, ADAM CHOW, TIARA
                                    PAULINO, SHARNIQUE MARTIN,
                                    GREGORY VASS, and OZELL
                                    MURRAY

COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL

# Exhibit A



# Exhibit B

## <u>DECLARATION OF ADAM CHOW</u>

1.     I, Adam Chow, hereby submit this declaration, generally, in support of Karen Draper's opposition to Tesla's motion for a protective order regarding the deposition of Elon Musk and, specifically, in support of Karen Draper's contention that Elon Musk did, in fact, personally promote her to the "HR-4-HR" manager position during an in-person meeting with the HR staff at Tesla's Fremont facility in June 2022.

2.     I worked for Tesla from approximately March 2022 to March 2024.  I worked as a HR professional during the entirety of my tenure with Tesla and physically worked out of its Fremont facility, where much of the company's vehicle manufacturing operations are based.

3.     During my time with Tesla, it was not unusual to myself experience or otherwise hear about Elon Musk—despite the fact that he was the CEO of the company—becoming personally involved in helping to resolve both high-level and low-level issues in Fremont.  Musk would visit the Fremont plant with some degree of frequency and was known to make himself accessible to both line-level and management-level employees.

4.     The same was true with respect to our HR team in Fremont.  There were instances in which Musk would meet with our HR team in person to resolve some of the issues we were struggling to rectify.  In 2022, our HR team was struggling with a variety of issues, and in particular a lack of HR leadership to help steer us through some workforce challenges in Fremont's manufacturing operation, which was experiencing rapid growth.

5.     I recall an in-person meeting that occurred with our HR team and Musk on June 9, 2022.  In particular, I recall that Musk initially expressed surprise and frustration when he learned that a woman named Aenoi Jones—whom Musk had personally appointed to become the overall HR leader for Tesla's Fremont facility—had not been permitted to assume that role.  Instead, the offsite HR leadership team at Tesla's Texas headquarters had hired a woman named Nicole Burgers in May 2022 to fill that role, apparently without Musk's knowledge.  Musk made it very clear that he had promoted Jones, not anyone else, and that he expected his personnel directive would be executed.

6.     At the time of that meeting, my position was as a "Senior HR Business Partner."  Karen Draper was also at the Musk meeting and held the title of "Senior HR Business Partner."

7.     Among the issues we discussed during that June 2022 Musk meeting was the attrition rate amongst employees in manufacturing operations.  The production demand for Tesla vehicles was exploding, but we were having a hard time as HR professionals hiring and retaining employees to keep up with the workforce need.

8.     Among other reasons for that difficulty, there were serious issues with racism and retaliation in Fremont that were causing a toxic workplace environment.  There were numerous Black employees that lodged complaints about having the word "n-gger" and other racial slurs

Doc ID: c30bfaf6a6d0d00468358315da7f8c6ec57c13be

used toward them, and that they were then being retaliated against for raising those complaints in the first place.

9.      The attrition problem amongst operations employees was having a derivative effect on the attrition rate amongst our HR staff.  HR professionals were leaving the company or otherwise feeling demoralized because we felt overworked and unsupported by leadership.

10.     We discussed these issues openly with Musk during the June 2022 meeting, and I was present and attentive to that discussion.  As a consequence of that discussion, Musk made a number of decisions and issued a number of directives.  Among Musk's directives was that Karen Draper would be promoted to a manager position and would fill the role of what we called "HR-4-HR."  That role was generally the person responsible for providing HR services for HR professionals, whether that was professional or personal counsel.

11.     As was his prerogative, and as with his directive to elevate Jones to the overall HR lead for Fremont, Musk promoted Draper right there on the spot and expected his directive to be executed.  Ultimately, Karen Draper did not receive the actual promotion that Elon Musk dictated.

12.     As HR professionals in Fremont, we were all quite aware—as a consequence of the many validated instances of racism and retaliation at the plant—when the State of California's Department of Civil Rights filed suit against Tesla in February 2022.  As a result, the messaging I received from our leadership was that were supposed to try to "reframe" the alleged instances of racism and retaliation we were responsible for investigating in light of that litigation and the likelihood of exacerbating the company's exposure with newly-validated incidents.  I understood that we were supposed to do our best to try to create an alternative "narrative" for incidents so that they did not appear to be race-based.  We were supposed to try to find ways to recharacterize the nature of our investigation and its outcome so that the central issue was predicated on something other than race, even though that was not the truth.

13.     I was fired because I investigated and validated an employee's complaint of racism.  A manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"  I investigated the Black employee's complaint, my investigation confirmed that the comment was indeed intended to be racially-derogatory, and, so, my manager and I recommended that the manufacturing employee be terminated.  Burgers first fired my manager for "poor performance" when, in reality, Burgers just wanted to suppress more instances of racism at Tesla.  After my manager was fired, Burgers terminated me shortly thereafter, also for purported "poor performance."

14.     Burgers was vindictive and retaliatory.  As the Fremont HR lead, I think Burgers believed that the toxic environment reflected poorly on her leadership ability, so she retaliated against those of us who spoke up.  Frequently, what I saw Burgers do was to open investigations against people for issues that were petty or otherwise grossly exaggerated as a means of "papering" your file to make you appear to be the wrongdoer and poor performer.  This would be the case even if you had just received positive reviews and feedback during your most recent formal performance assessment.  Regardless, Burgers would suddenly blindside you with some

Doc ID: c30bfaf6a6d00468358315da7f8c6ec57c13be

overstated issue that she claimed reflected so negatively on your performance that it warranted separation and a severance package.

I declare the foregoing to be true and, if called to testify verbally, I could and would articulate the same under penalty of perjury.


Dated: _____09 / 12 / 2024_____          Signed: _____

# Exhibit C





# Exhibit D

**From:** Karen Draper <kadraper@tesla.com>
**Date:** Thursday, June 9, 2022 at 11:13 PM
**To:** Elon Musk █████████████████
**Cc:** Hrushikesh Sagar █████████████████, Aenoi Jones █████████████████
**Subject:** HR Fremont Team (Skip-Level) Meeting 6/8/22 Follow Up

Hello Mr. Musk,

      As discussed, please find below the notes from the 6/8/22 on-site meeting with HR Fremont, CA. Please review and reply as appropriate. Thank you.

**2/22/22 – Previous Meeting Task Updates**
1. Parking Lot – additional light installation
2. Security Team Enhancements
3. Additional Surveillance/Camera System Upgrades
4. On-site LOA and Payroll Personnel

**Meeting Minutes**
In alignment with Elon's expectations - all Business and HR Leaders will be physically present at the locations they lead/support:
Effective Immediately – **Aenoi Jones**, will assume the role of Site HR Leader (HR Director) @ Fremont, CA
                        (as previously assigned by Elon on 2/22/22)
Effective Immediately -HR for HR role/responsibilities will be reassigned from:
        **Allie Arebalo @ Giga, TX > Karen Draper @ Fremont, CA**.

1. <span style="color:red">Staffing/Hiring Challenges Plan to Action @ Fremont, CA</span>
Local HR Leader will leverage current internal talent to fill critical/difficult-to-fill roles.
Effective Immediately:
**Angela Roundtree, Sr. HRBP > HR Manager @ Fremont, CA**
**Keiahnna Poole, Sr. HRBP > HR Manager @ Fremont, CA**

2. <span style="color:red">Staff Retention of Top Talent Plan</span>

Effective Immediately – local HR will evaluate and deliver 'appreciation bonus award' for current HR teams **by end of Q2.**
Local HR Leader will develop and implement Career Path/Training Module for HRC role @ Fremont. Ex.
**(S1>S2>S3>S4>Lead(I-IV)>Supervisors>AM>Manager)**
Local HR will evaluate HR Production Team premium/differential (workload vs. other HR teams).

### 3. Market Adjustments/Competitive Pay Alignment – Bay Area, CA

Local HR Leader will lead and implement local **HR Market Compensation Analysis** to establish new pay scale and appropriate increases for HR roles **by end of Q2.**

### 4. Relocation Costs & Expenses (to attract/hire and retain top candidates)

Local HR Leader will partner with Finance Leadership to evaluate and align to the location COL (Cost of Living) @ Fremont, CA.

### 5. Systems Access

Local HR Leader will partner with appropriate business partners to establish access/training to HRP's – for all HRIS systems – including IST/ER/LOA/Payroll/ADA/KRONOS/. Goal is to mitigate redundancy in tasks and reduce timeline for open employee relations issues.
Local HR will Partner with the appropriate leadership to recruit/hire on-site Stock Admin associate(s).

### 6. Budget

-Local HR Leader will partner with appropriate business leader to establish a budget for HR related projects:
   1. Team Building Events/Outings
   2. Celebrations
   3. Team Gear (Swag)
   4. Rewards/Recognition/Bonuses/Awards

### 7. Other Items

HR will receive 2 electric/battery powered vehicles **(golf carts)** for ease of access to service client groups.


Local Point of Contact:  Hrushikesh "Hrushi" Sagar
Items to escalate to Elon:  Anything that Hrushi cannot resolve
Elon's Email: ▮▮▮▮▮▮▮▮▮▮ (Best after midnight)

---

**Confirmation of action items approved by Elon:**
Hrushi can approve Immigration and Relocation Exceptions
Hrushi can approve comp adjustments up to $500k (prev. limit $100k)
Hrushi can authorize internal moves/promotions (outside of IM criteria) for Critical Roles.

Increased Salary Range for roles (new/existing)
   1. P2 – up to $96k - $128k
   2. P3 – up to $129 - $157k

HR for HR will be local and on-site @ Fremont, CA under Karen Draper (reporting to Hrushi)
The following people-support team members will report under Fremont HR for HR
   1. Compensation Support partner Jorge Kornblueh
   2. Recruiting Team Support partner Lily Crowley
   3. (2) ER support partners (TBD)

4. All Fremont direct-support, people relations teams reporting to leaders in other locations i.e., Training/Onboarding/ADA etc.

**I Appreciate You!**

**Karen Draper** | **Sr. HR Business Partner** | Production HR

45500 Fremont Blvd | Fremont, CA 94538

E. kadraper@tesla.com



**From:** Karen Draper <kadraper@tesla.com>
**Date:** Friday, August 19, 2022 at 12:55 PM
**To:** Karen Draper ████████████████████
**Subject:** FW: Fremont HR Team


## I Appreciate You!

**Karen Draper** | **Sr. HR Business Partner** | Production HR

45500 Fremont Blvd | Fremont, CA 94538

E. <u>kadraper@tesla.com</u>





---

**From:** Karen Draper
**Sent:** Thursday, July 21, 2022 11:14 PM
**To:** Elon Musk ████████████████

**Cc:** Aenoi Jones ███████████████████; Hrushikesh Sagar ███████████████████
**Subject:** Fremont HR Team

Hello,

I am writing you tonight to provide an update on the status of our HR Team. Since your last visit, we have seen some slight improvements such as leveraging our internal talent in HR by offering internal promotions and the official appointment of Aenoi Jones as the Site HR Leader. However, there are some important items that remain unfulfilled. Specifically, you were very clear and deliberate that any Leader with direct reports at Fremont, should be physically present at Fremont, yet that continues not to be true. We specifically discussed the lack of support from our external partners and teams; particularly, the lack of HR4HR on-site. You stated that you wanted that service to be visible and accessible to our team - and you appointed me as the person to lead that initiative. However, since you gave that directive, the leadership team from Giga-Texas/Nevada (Omead/Bert and Allie) have launched a campaign to undermine your authority and have actively worked against empowering Hrushi and Aenoi to lead our site. This was the same undermining that occurred when they hired 2 new Sr. HR Managers over Aenoi - after you appointed her the Site Leader in February. Honestly, I feel that they are intimidated by Fremont and fear that when we assume control of our teams and our site - their incompetence will be exposed. Aenoi and Hrushi have been working together trying to establish their positions and secure support services such as HR4HR at our site - as they understand the critical natural is not having this support system. But they continue to be met with opposition from Texas/Nevada leadership. The Fremont Production HR team works tirelessly, day and night supporting the mission of the business, but we cannot even get the basic support of an HR4HR partner. There are no services to support us - physically, mentally, emotionally. We are all deeply committed to Tesla...that's why we are here. Yet, we are dismissed and met with opposition and ignorance from Texas/Nevada leadership. The current HR4HR regime has been absent, unresponsive, and dismissive. I can confidently say that you could count on one hand how many people on our team have ever met Allie or received support from her. For those who have attempted to seek her support, they have been met with silence, incompetence, and ignorance. **There is not one success story from the current HR4HR Texas team**.

Fremont is your Flagship Site. It houses the largest HR team and the largest overall employee population, yet we find ourselves shut out, ignored, and begging for services. Fremont just produced your 2 Millionth vehicle - largely on the backs of a forgotten HR team. Without the leadership and commitment of members of this HR team and our partners (recruiting/training/compensation) we could not have successfully met this goal. We bring the people in the doors, and we work hard to keep them here. HR provides this business with the invaluable service of retaining the talent needed to run this business. We were a very lean team, yet we powered through, servicing client groups of up to 2500:1. We are constantly acting as agents of this business, mitigating lawsuits, and driving employee engagement - but it feels thankless. Fremont deserves better than this. We have the internal talent and experience to lead our site and set the example for all your other locations. We should not be regulated to scraps and denigrated to begging Texas/Nevada to support us. This week, a newly hired HR4HR person from Texas - Leah Allen - who is supposedly here to support us- we've seen once. She is inexperienced and unable to provide the support that this team needs and deserves. Having HR4HR Fremont, sitting in Texas - or anywhere else is useless. Having HR4HR permanently on-site at Fremont is critical to sustaining this team. We have the internal talent - you said it yourself. The act of bringing another Texas/Nevada person to lead Fremont is a slap in our face and a direct undermining of your authority. Empower us, empower Hrushi, empower Aenoi...you have the right team at Fremont - now, trust us to show you that we can be the true Tesla leaders. Thank you.


I Appreciate You!
Karen Draper
Sr. HR Business Partner-Production
Tesla

**From:** Karen Draper ████████████████
**Date:** Saturday, February 11, 2023 at 12:04 AM
**To:** ████████████████████████
**Subject:** Today was my last day at Tesla…THANK YOU!!!

Hello Elon,

I'm writing you this email to say THANK YOU! Thank you for the opportunity to be a part of your vision for Tesla at the Fremont, CA plant. I joined Tesla just 1 year ago, with great excitement about the future of the mission and the prospect of making a value-added impact on the culture and employee experience. I believe in the mission of Tesla and I respect your unwavering commitment to it. I am proud to have been a part of it!          When I initially joined Tesla, I started with the Model-Y/GA4 Production team as a Sr.HRBP and then an Assoc., HR Manager for the same team. I was committed to this team and from the onset I had a goal to transform the negative narrative around a very fractured relationship between GA4 and HR; while simultaneously fostering an environment where all employees felt valued, heard, seen and respected. I'd like to think that I had some great successes on both points, and made a significant impact on the overall employee experience - based on the positive feedback from many GA4 leaders, employees, and our extended business partners. I am proud of that! Unfortunately, I quickly learned that not all 'leaders' at Tesla are aligned with these ideals, and would rather maintain the status quo, to protect their own agendas. As a result, tonight my employment was ended under the guise of 'Failure to Meet Performance Expectations' - which I find ironic since my previous PA score (after only 3 months) was a strong 3.5, then I was promoted after only 6 months, and I have **never** received any feedback, corrective action or performance related conversation which would indicate that I was underperforming.

This feels a lot like targeting and retaliation for escalating concerns about the lack of integrity, lack of accountability, lack of leadership and for calling out the grossly corrupt and manipulative behaviors of current leaders. I'm certain that my refusal to align with illegal practices related to the treatment of employees, my consistent practice of holding leadership accountable for misconduct, and my vocal disagreement with dangerous and risky business decisions , are the true reasoning for my separation. I would challenge you to find any quantifiable evidence, facts or examples that substantiate the claim of underperformance. In fact, you will more easily find evidence that I am consistently a Top Performer. I will acknowledge that you may find some bruised egos and hurt feelings along the way - because some people can't handle the truth about themselves and their ineptitude, but absolutely nothing that could be considered 'underperforming'. Nonetheless, I'm grateful…grateful for the opportunity to have been the type of TRUE LEADER that your employees deserve. I am the type of leader that always leads with integrity and honesty, who supports, trusts, empowers, develops and builds-up. I have successfully nurtured an amazing team of young HR Professionals who worked with me during my time at Tesla, and who I am confident will continue grow and care about the people at Tesla - because I cared about

1

them! My hope is that I have prepared them, fortified and strengthened them enough to withstand the destructive environment that I left them in, and that they will have the courage and discernment to know when to walk away from it. They are the legacy I leave behind. Just ask them…they will be honest.

I Appreciate You!
~Karen Pinks-Draper
Sent from my iPhone

# Exhibit E

JAMS

KAREN DRAPER                                    Arbitration No.5100001254

      Claimant,                               ORDER PARTIALLY GRANTING
                                        MOTION FOR PROTECTIVE ORDER

      Vs.

TESLA, INC.

      Respondent

_____/

    A virtual discovery hearing was conducted in this matter on September 16, 2024, at 10:00 A.M. PST pursuant to written notice.  Attorney Terrence Jones of Cameron Jones LLP appeared for Claimant.  Attorney Graham Helm of Ogletree Deakins appeared for Respondent. The following order is made with respect to the arbitration:

1. <u>Parties and Counsel</u>: The parties to this arbitration are identified in the caption and are represented as follows:

    Terrence Jones
    Cameron Jones LLP
    6737 Bright Ave., Suite B6
    Whittier, CA 90601
    Phone: 213-863-4490
    Email: terrence@cameronjoneslaw.com

    Representing Claimant, Karen Draper

    Danielle Ochs
    Graham Helm
    Ogletree Deakins
    One Embarcadero Center, Suite 900
    San Francisco, CA 94111
    Graham Helm Phone: 415-442-4810
    Danielle Ochs Phone: 415-536-3429
    Fax: 415-442-4787
    Email: graham.helm@ogletree.com
    Email: danielle.ochs@ogletree.com

    Representing Respondent, Tesla, Inc.

2.  <u>Arbitrator</u>:

>   Hon. Lynn O'Malley Taylor (Ret.)
>   JAMS
>   Two Embarcadero Center, Suite 1500
>   San Francisco, CA 94111
>   Telephone: 415-982-5267
>   Fax: 415-982-5287
>   Email: ltaylor@jamsadr.com

3.  <u>Case Manager</u>:

>   John Peterson
>   JAMS
>   Two Embarcadero Center, Suite 1500
>   San Francisco, CA 94111
>   Telephone: 415-982-5267/Direct: 415-774-2609
>   Fax: 415-982-5287
>   Email: jpeterson@jamsadr.com

4.  <u>Motion for Protective Order</u>:

On September 6, 2024, Respondent filed a Motion for Protective Order to Prevent the taking of the deposition of Elon Musk. On September 13, 2024, Claimant file his Opposition to Respondent's Motion.

Respondent's Arguments

Apex depositions can only be held where the proposed deponent has firsthand, *unique* knowledge of the issues in the case. *Jordan v. Wonderful Citrus Packing LLC, 2019 WL 176264 (E.D. Cal. Jan. 11, 2019)* Musk has no unique knowledge of any relevant issues and claimant failed to first utilize less intrusive methods of discovery.

Whether Musk promoted Claimant at the June 2022 Meeting or recalls anything from that Meeting is irrelevant. Whether Musk "promoted" Claimant at the June 2022 Meeting is irrelevant because Claimant's discrimination, retaliation, and wrongful termination claims are based on the alleged conduct of Burgers, in which Musk had no involvement.

Claimant cannot show that Musk had unique knowledge of any relevant issue or that she exhausted less intrusive means of discovery. Even if Musk promoted Claimant during the June 2022 Meeting and that is relevant to the issues (which Respondent disputes), Musk does not have any unique first-hand knowledge about what occurred during the June 2022 Meeting because numerous employees attended that meeting. Those witnesses can testify about what occurred and what was said during the June 2022 Meeting. Accordingly, whatever Musk may recall about the June 2022 Meeting is merely repetitive of others' knowledge.

2

Claimant not yet deposed Burgers who evaluated Claimant's performance and decided to terminate her.

Limited written deposition questions are appropriate under FRCP Rule 26(c)(1), the Arbitrator may direct Claimant to proceed with other methods of discovery, such as limited written deposition questions under FRCP 30(c)(3), in order to protect a person from annoyance, embarrassment, oppression, or undue burden.

Respondent is entitled to attorneys' fees for Bringing this Motion. *Fed. R. Civ. P.37(a)(5)(A)*.

<u>Claimant's Opposition</u>

Elon Musk hand-selected Ms. Draper for promotion during an In-Person Meeting in June 2022.  Ms. Draper suggested that it was impractical and inefficient to have the HR-for HR management role performed by Texas based management. Musk told Ms. Draper that he wanted her to fill that HR-for-HR management role in Fremont. She accepted, so Musk promoted her right there on-the-spot.

Ms. Draper was terminated in retaliation for refusing to carry out a Production Manager's Desire to fire an employee on protected medical leave. Burgers, Draper's Manager, was motivated by a desire to suppress additional findings of retaliation arising out of the Fremont facility because of the pending litigation against Tesla. As the facility's overall HR lead, Burgers believed that additional findings would negatively impact assessment of her ability to eliminate the culture of racism and retaliation in Fremont and to impact the workplace environment in a positive way.

Musk's promotion of Ms. Draper undermines Burgers' proffered "poor performance" basis for terminating her and instead supports Claimant's pretext contention. Plainly, it is difficult to credibly characterize someone as a terminable poor performer when the CEO of the Company had just personally promoted that person because of exceptional performance. The fact that Burgers then fired Ms. Draper from that role to which she had been appointed—without Musk's approval and validation—tends to show an intentional concealment of the termination so that Musk would not know that his personal choice had been pushed out.

This particular situation differs from the typical "apex doctrine" scenario in which a party seeks to randomly depose a C-suite executive who had absolutely no direct involvement in the underlying facts. Here, Musk is a percipient witness that has direct knowledge and direct involvement in facts materially relevant to the case. He attended a seminal meeting, issued a seminal personnel directive, asked for confirming emails, and then engaged with those emails to ensure that his personal directives were understood and followed.

Ms. Draper has exhausted less intrusive discovery methods, which only emphasize the factual dispute that only Musk can resolve. Tesla respondent with boiler plate answers to special interrogatories and requests for admission and failed to verify its responses.

Tesla did not submit one supporting declaration with its briefing papers for this motion from any Tesla employee present at the subject meeting attesting to the Company's contention that Musk did not promote Ms. Draper to the HR-for-HR manager position that day. Respondent has not established "good cause" for precluding Musk's deposition because it has not produced anything, other than argument, to dispute Claimant's actual evidence in support of her position. Accordingly, Claimant should be permitted to depose Elon Musk relative to the issues described herein.

<u>ORDER</u>

Tesla has denied, without opposing declarations, that Elon Musk promoted Claimant Draper at the June 8, 2022 meeting. Rather than proceeding with an oral deposition of Mr. Musk, Claimant may pose written direct deposition questions to Mr. Musk about the purpose of the meeting and his concerns about HR at the Fremont Plant, about Ms. Draper, what he knew of Ms. Draper prior to the June Meeting, what he learned from her or about her during the meeting, whether he told Ms. Draper that he wanted her to fill that HR-for-HR management role in Fremont during the meeting, whether after he chose Ms. Draper he knew she had been terminated or had any involvement in her termination etc.

If Mr. Musk fails to respond directly in writing to the questions posed, Claimant may renew her request to take the oral deposition of Mr. Musk.

As the motion was granted in part, Respondent is entitled to a partial award of attorney's fees for making the motion. Respondent may file a specific request for attorney's fees by September 24, 2024. Claimant shall file a response by October 1, 2024. A hearing on the Attorney's fee issue is set for October 11, 2024, at 9:30 A.M. PST.

September 17, 2024

_____
Hon. Lynn O'Malley Taylor, Ret., Arbitrator

4

# Exhibit F

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency          GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Terrence Jones
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:    **Notice to Complainant's Attorney**
       CRD Matter Number: 202508-30657407
       Right to Sue: Peloquin / Tesla, Inc.

Dear Terrence Jones:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

RE:  **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202508-30657407
Right to Sue: Peloquin / Tesla, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GAVIN NEWSOM, GOVERNOR

**Civil Rights Department**                                                                              KEVIN KISH, DIRECTOR
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Linda Peloquin
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:    **Notice of Case Closure and Right to Sue**
       CRD Matter Number: 202508-30657407
       Right to Sue: Peloquin / Tesla, Inc.

Dear Linda Peloquin:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective August 7, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**Civil Rights Department**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Linda Peloquin                                    CRD No. 202508-30657407

                          Complainant,

vs.

Tesla, Inc.
1 Tesla Road
Austin, TX 78725

                          Respondents

---

**1.** Respondent **Tesla, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Linda Peloquin**, resides in the City of **Los Angeles,** State of **CA.**

**3.** Complainant alleges that on or about **December 11, 2023**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's sex/gender, gender identity or expression, sexual orientation, medical condition (cancer or genetic characteristic), age (40 and over), other, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture).

**Complainant was discriminated against** because of complainant's sex/gender, gender identity or expression, sexual orientation, medical condition (cancer or genetic characteristic), age (40 and over), other, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture) and as a result of the discrimination was terminated, forced to quit, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

-1-
*Complaint – CRD No. 202508-30657407*

Date Filed: August 7, 2025

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a disability-related accommodation, participated as a witness in a discrimination or harassment complaint and as a result was terminated, laid off, forced to quit, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied accommodation for a disability, given additional work responsibilities or assignments.

**Additional Complaint Details:** Complainant Linda Peloquin ("Complainant") was subjected to unlawful harassment, discrimination, and retaliation in violation of the Fair Employment and Housing Act (FEHA) on account of Complainant's: perceived race; perceived sexuality; perceived disability; complaints of discriminatory conduct by other employees; and complaints of potential violations of local, state, and federal law.

Complainant was employed by Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." (hereinafter, "Tesla," "Defendant," or the "Company"). Complainant worked as a Human Resources ("HR") professional for the auto production unit of Tesla at its facility in Fremont, California. Complainant began working for Tesla on or about March 27, 2023, and was actually and constructively terminated on or about December 11, 2023.

The proffered basis for Complainant's termination was pretextual. The decision to terminate Complainant, as validated by Tesla's executive staff and managing agents was not truly the result of intentionally-nondescript "performance issues," but was instead rooted in retaliatory and discriminatory animus as a direct consequence of Complainant's objections about Tesla's efforts to minimize and artificially recharacterize the alleged instances of racism and retaliation that HR professionals were responsible for investigating in light of pending litigation against Tesla and the likelihood of exacerbating the company's exposure with newly-validated incidents.

In or about November 2022, an operations manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave. An HR official named Karen Draper refused the operations managers' repeated requests to terminate the employee for taking medica leave since, of course, that would have constituted illegal disability-based retaliation. But yet, Draper was fired for "poor performance."

In or about October 2023, a manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"—plainly threatening to lynch him as were tens of thousands of Black men and women during and after slavery. An HR official, named Adam Chow, investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be physically threatening and racially derogatory, and, so, Chow recommended that the manufacturing employee be terminated. But yet, Chow was chastised and given a poor rating on his performance evaluation. He was then threatened with agreeing to either a "Performance Improvement Plan" with benchmarks that were intentionally unachievable or to a severance package with strict legal recourse waivers and nondisclosure language. Either way, the message was clear: Tesla wanted him gone. So, Chow had no choice but to resign to avoid that stain on his job record.

-2-
*Complaint – CRD No. 202508-30657407*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

In or about November 2023, Chow's direct supervisor, Linda Peloquin, spoke up in defense of his performance. She had supervised his "hang by a tree" investigation and endorsed his termination recommendation. But yet, Peloquin, too, was then terminated for poor performance. Her termination came after Peloquin's Tesla HR higher-ups told her that the number of validated race-based complaints at Fremont was too high and that they as HR managers needed to somehow reduce those numbers—particularly in light of all the pending litigation.

In or about December 2023, following those alarming and clearly retaliatory terminations, two HR professionals—Tiara Paulino and Sharnique Martin—drafted and sent an email to high-level operations officials at the Fremont facility explaining, among other things, their fear of retaliation for investigating and validating employees' workplace complaints. They, too, were fired just weeks later as reprisal.

In or about January 2022, the Fremont facility's Senior Manager of Physical Security Operations, Ozell Murray, was outspoken with his direct supervisor about what Murray perceived to be racially insensitive and insulting direction with respect to new Black would-be hires in the Security Department. The use of the "N-word" was prevalent throughout the Fremont facility. A few months prior, one of Murray's direct-reports, a female security officer who was also a former police officer, was victimized when a Tesla employee called her a nigger. Murray's colleague was so distressed by the incident and the impunity with which the word was used toward her and around the Fremont facility that she had to take a medical leave from work to recover from the trauma. Yet, instead of offering encouragement, Murray's supervisor, counseled him that Murray should be informing all new Black security personnel that the use of the "N-word" was simply engrained in the culture at Tesla and, so, Murray should only be bringing aboard those that were willing to accept and acquiesce to the prevalence of that word in the workplace.

In or about June 2023, a HR professional named Gregory Vass was unilaterally placed by the overall Fremont HR manager into a "Pride Group." Vass had not asked to be placed in this group, nor was he aware of any other HR professionals being asked if they wanted to support whatever the mission of the Pride Group was. The HR manager advised Vass that one of the group's initial projects was to create a slide deck with facts about the LGBTQ community that would be played in the cafeteria to help raise awareness and educate employees.

Vass was profoundly uncomfortable with being unilaterally placed in the Pride Goup since it appeared to him that he was singled out to be a part of the group and execute its mission because of his sexuality. Vass expressed those concerns to his coworkers at the time.

In or about October 2023, Vass voiced his concerns and complaints to the designated HR-for-HR Manager that physically sat in Tesla's Texas headquarters. Yet she, in turn, shared Vass' complaints directly with the Fremont HR manager about whom Vass was complaining. Vass was then terminated five months later as a direct result of that retaliatory animus.

In response to Complainant's protected activities, Tesla retaliated against Complainant, including, but not limited to: harassing and hassling Complainant both during and outside of normal work hours; unreasonably and unjustifiably increasing Complainant's workload; unreasonably and unjustifiably criticizing the speed with which Complainant was completing assignments; unreasonably and unjustifiably criticizing the quality of

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

Complainant's work product and general job execution; questioning and criticizing Complainant for taking sick and disability leave; forcing Complainant to take medical and/or administrative leave; offering and/or placing Complainant onto a sham, last-chance Performance Improvement Plan; and, terminating Complainant's employment.

Complainant's Tesla managers, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Complainant was treated; they were treated more favorably.  Thus, Complainant's Tesla managers, as well as their agents and subordinates, personally singled Complainant out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Complainant's employment, ultimately culminating in wrongful termination, because of Complainant's protected activities and characteristics.

Date Filed: August 7, 2025

1    VERIFICATION

2    I, **Terrence Jones**, am the **Attorney** in the above-entitled complaint.  I have read the
3    foregoing complaint and know the contents thereof. The matters alleged are based on
     information and belief, which I believe to be true. The matters alleged are based on
4    information and belief, which I believe to be true.

5    On August 7, 2025, I declare under penalty of perjury under the laws of the State of
     California that the foregoing is true and correct.
6

7                                                                          **Los Angeles, CA**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                              -5-
                                  *Complaint – CRD No. 202508-30657407*
27
     Date Filed: August 7, 2025
28
                                                              CRD-ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Terrence Jones
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:    **Notice to Complainant's Attorney**
CRD Matter Number: 202508-30657607
Right to Sue: Chow / Tes

Dear Terrence Jones:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

RE:  **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202508-30657607
Right to Sue: Chow / Tes

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency          GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Adam Chow
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:   **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202508-30657607
Right to Sue: Chow / Tes

Dear Adam Chow:

This letter informs you that the above-referenced complaint filed with the Civil Rights
Department (CRD) has been closed effective August 7, 2025 because an immediate
Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation
Program. Under this program, established under Government Code section
12945.21, a small employer with 5 -19 employees, charged with violation of the
California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave
(Government Code sections 12945.2, 12945.6, or 12945.7) has the right to
participate in CRD's free mediation program. Under this program both the
employee requesting an immediate right to sue and the employer charged with
the violation may request that all parties participate in CRD's free mediation
program. The employee is required to contact the Department's Dispute
Resolution Division prior to filing a civil action and must also indicate whether
they are requesting mediation. The employee is prohibited from filing a civil
action unless the Department does not initiate mediation within the time period
specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. Contact
CRD's Small Employer Family Leave Mediation Pilot Program by emailing
DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number
indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

## COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**

Adam Chow                                    CRD No. 202508-30657607

                    Complainant,

vs.

Tes
1 Tesla Road
Austin, TX 78725

                    Respondents

---

**1.** Respondent **Tes** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Adam Chow**, resides in the City of **Los Angeles,** State of **CA.**

**3.** Complainant alleges that on or about **March 11, 2024**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's color, sex/gender, gender identity or expression, sexual orientation, medical condition (cancer or genetic characteristic), other, association with a member of a protected class, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture).

**Complainant was discriminated against** because of complainant's sex/gender, gender identity or expression, sexual orientation, medical condition (cancer or genetic characteristic), other, association with a member of a protected class, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture) and as a result of the discrimination was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a disability-related accommodation, participated as a witness in a discrimination or harassment complaint and as a result was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

**Additional Complaint Details:** Complainant Adam Chow ("Complainant") was subjected to unlawful harassment, discrimination, and retaliation in violation of the Fair Employment and Housing Act (FEHA) on account of Complainant's: perceived race; perceived sexuality; perceived disability; complaints of discriminatory conduct by other employees; and complaints of potential violations of local, state, and federal law.

Complainant was employed by Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." (hereinafter, "Tesla," "Defendant," or the "Company"). Complainant worked as a Human Resources ("HR") professional for the auto production unit of Tesla at its facility in Fremont, California.  Complainant began working for Tesla on or about March 1, 2022, and was actually and constructively terminated on or about March 11, 2024.

The proffered basis for Complainant's termination was pretextual.  The decision to terminate Complainant, as validated by Tesla's executive staff and managing agents was not truly the result of intentionally-nondescript "performance issues," but was instead rooted in retaliatory and discriminatory animus as a direct consequence of Complainant's objections about Tesla's efforts to minimize and artificially recharacterize the alleged instances of racism and retaliation that HR professionals were responsible for investigating in light of pending litigation against Tesla and the likelihood of exacerbating the company's exposure with newly-validated incidents.

In or about November 2022, an operations manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave.  An HR official named Karen Draper refused the operations managers' repeated requests to terminate the employee for taking medica leave since, of course, that would have constituted illegal disability-based retaliation.  But yet, Draper was fired for "poor performance."

In or about October 2023, a manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"—plainly threatening to lynch him as were tens of thousands of Black men and women during and after slavery.  An HR official, named Adam Chow, investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be physically threatening and racially derogatory, and, so, Chow recommended that the manufacturing employee be terminated. But yet, Chow was chastised and given a poor rating on his performance evaluation.  He was then threatened with agreeing to either a "Performance Improvement Plan" with

Date Filed: August 7, 2025

benchmarks that were intentionally unachievable or to a severance package with strict legal recourse waivers and nondisclosure language.  Either way, the message was clear:  Tesla wanted him gone.  So, Chow had no choice but to resign to avoid that stain on his job record.

In or about November 2023, Chow's direct supervisor, Linda Peloquin, spoke up in defense of his performance.  She had supervised his "hang by a tree" investigation and endorsed his termination recommendation.  But yet, Peloquin, too, was then terminated for poor performance.  Her termination came after Peloquin's Tesla HR higher-ups told her that the number of validated race-based complaints at Fremont was too high and that they as HR managers needed to somehow reduce those numbers—particularly in light of all the pending litigation.

In or about December 2023, following those alarming and clearly retaliatory terminations, two HR professionals—Tiara Paulino and Sharnique Martin—drafted and sent an email to high-level operations officials at the Fremont facility explaining, among other things, their fear of retaliation for investigating and validating employees' workplace complaints.  They, too, were fired just weeks later as reprisal.

In or about January 2022, the Fremont facility's Senior Manager of Physical Security Operations, Ozell Murray, was outspoken with his direct supervisor about what Murray perceived to be racially insensitive and insulting direction with respect to new Black would-be hires in the Security Department.  The use of the "N-word" was prevalent throughout the Fremont facility.  A few months prior, one of Murray's direct-reports, a female security officer who was also a former police officer, was victimized when a Tesla employee called her a nigger.  Murray's colleague was so distressed by the incident and the impunity with which the word was used toward her and around the Fremont facility that she had to take a medical leave from work to recover from the trauma.  Yet, instead of offering encouragement, Murray's supervisor, counseled him that Murray should be informing all new Black security personnel that the use of the "N-word" was simply engrained in the culture at Tesla and, so, Murray should only be bringing aboard those that were willing to accept and acquiesce to the prevalence of that word in the workplace.

In or about June 2023, a HR professional named Gregory Vass was unilaterally placed by the overall Fremont HR manager into a "Pride Group."  Vass had not asked to be placed in this group, nor was he aware of any other HR professionals being asked if they wanted to support whatever the mission of the Pride Group was.  The HR manager advised Vass that one of the group's initial projects was to create a slide deck with facts about the LGBTQ community that would be played in the cafeteria to help raise awareness and educate employees.

Vass was profoundly uncomfortable with being unilaterally placed in the Pride Goup since it appeared to him that he was singled out to be a part of the group and execute its mission because of his sexuality. Vass expressed those concerns to his coworkers at the time.

*Complaint – CRD No. 202508-30657607*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

In or about October 2023, Vass voiced his concerns and complaints to the designated HR-for-HR Manager that physically sat in Tesla's Texas headquarters. Yet she, in turn, shared Vass' complaints directly with the Fremont HR manager about whom Vass was complaining. Vass was then terminated five months later as a direct result of that retaliatory animus.

In response to Complainant's protected activities, Tesla retaliated against Complainant, including, but not limited to: harassing and hassling Complainant both during and outside of normal work hours; unreasonably and unjustifiably increasing Complainant's workload; unreasonably and unjustifiably criticizing the speed with which Complainant was completing assignments; unreasonably and unjustifiably criticizing the quality of Complainant's work product and general job execution; questioning and criticizing Complainant for taking sick and disability leave; forcing Complainant to take medical and/or administrative leave; offering and/or placing Complainant onto a sham, last-chance Performance Improvement Plan; and, terminating Complainant's employment.

Complainant's Tesla managers, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Complainant was treated; they were treated more favorably. Thus, Complainant's Tesla managers, as well as their agents and subordinates, personally singled Complainant out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Complainant's employment, ultimately culminating in wrongful termination, because of Complainant's protected activities and characteristics.

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

1  VERIFICATION

2  I, **Terrence Jones**, am the **Attorney** in the above-entitled complaint.  I have read the
3  foregoing complaint and know the contents thereof. The matters alleged are based on
   information and belief, which I believe to be true. The matters alleged are based on
4  information and belief, which I believe to be true.

5  On August 7, 2025, I declare under penalty of perjury under the laws of the State of
   California that the foregoing is true and correct.
6

7                                                              **Los Angeles, CA**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                            -5-
                              *Complaint – CRD No. 202508-30657607*
27
   Date Filed: August 7, 2025
28

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Terrence Jones
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:     **Notice to Complainant's Attorney**
        CRD Matter Number: 202508-30657707
        Right to Sue: Paulino / Tesla, Inc.

Dear Terrence Jones:

Attached is a copy of your complaint of discrimination filed with the Civil Rights
Department (CRD) pursuant to the California Fair Employment and Housing Act,
Government Code section 12900 et seq. Also attached is a copy of your Notice of Case
Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

RE:    **Notice of Filing of Discrimination Complaint**
       CRD Matter Number: 202508-30657707
       Right to Sue: Paulino / Tesla, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Tiara Paulino
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:    **Notice of Case Closure and Right to Sue**
       CRD Matter Number: 202508-30657707
       Right to Sue: Paulino / Tesla, Inc.

Dear Tiara Paulino:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective August 7, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

1

## COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

2

3

4

**In the Matter of the Complaint of**

5

Tiara Paulino                                                      CRD No. 202508-30657707

6
                                                 Complainant,

7

vs.

8

Tesla, Inc.
1 Tesla Road
Austin, TX 78725

9

10
                                                 Respondents

11
_____

12

**1.** Respondent **Tesla, Inc.** is an **employer** subject to suit under the California Fair Employment
and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

13

14

15

**2**. Complainant **Tiara Paulino**, resides in the City of **Los Angeles,** State of **CA.**

16

17

**3.** Complainant alleges that on or about **February 23, 2024**, respondent took the
following adverse actions:

18

19

**Complainant was harassed** because of complainant's color, sex/gender, gender identity or
expression, sexual orientation, medical condition (cancer or genetic characteristic), other,
association with a member of a protected class, disability (physical,
intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair
texture).

20

21

22

**Complainant was discriminated against** because of complainant's sex/gender, gender
identity or expression, sexual orientation, genetic information or characteristic, other,
association with a member of a protected class, disability (physical,
intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair
texture) and as a result of the discrimination was terminated, laid off, forced to quit, denied
hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or
assignments, denied accommodation for a disability, given additional work responsibilities or
assignments.

23

24

25

26

-1-
*Complaint – CRD No. 202508-30657707*

27

Date Filed: August 7, 2025

28

CRD-ENF 80 RS (Revised 2025/02)

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, participated as a witness in a discrimination or harassment complaint and as a result was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

**Additional Complaint Details:** Complainant Tiara Paulino ("Complainant") was subjected to unlawful harassment, discrimination, and retaliation in violation of the Fair Employment and Housing Act (FEHA) on account of Complainant's: perceived race; perceived sexuality; perceived disability; complaints of discriminatory conduct by other employees; and complaints of potential violations of local, state, and federal law.

Complainant was employed by Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." (hereinafter, "Tesla," "Defendant," or the "Company"). Complainant worked as a Human Resources ("HR") professional for the auto production unit of Tesla at its facility in Fremont, California. Complainant began working for Tesla on or about June 27, 2022, and was actually and constructively terminated on or about February 23, 2024.

The proffered basis for Complainant's termination was pretextual. The decision to terminate Complainant, as validated by Tesla's executive staff and managing agents was not truly the result of intentionally-nondescript "performance issues," but was instead rooted in retaliatory and discriminatory animus as a direct consequence of Complainant's objections about Tesla's efforts to minimize and artificially recharacterize the alleged instances of racism and retaliation that HR professionals were responsible for investigating in light of pending litigation against Tesla and the likelihood of exacerbating the company's exposure with newly-validated incidents.

In or about November 2022, an operations manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave. An HR official named Karen Draper refused the operations managers' repeated requests to terminate the employee for taking medica leave since, of course, that would have constituted illegal disability-based retaliation. But yet, Draper was fired for "poor performance."

In or about October 2023, a manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"—plainly threatening to lynch him as were tens of thousands of Black men and women during and after slavery. An HR official, named Adam Chow, investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be physically threatening and racially derogatory, and, so, Chow recommended that the manufacturing employee be terminated. But yet, Chow was chastised and given a poor rating on his performance evaluation. He was then threatened with agreeing to either a "Performance Improvement Plan" with

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

benchmarks that were intentionally unachievable or to a severance package with strict legal recourse waivers and nondisclosure language.  Either way, the message was clear:  Tesla wanted him gone.  So, Chow had no choice but to resign to avoid that stain on his job record.

In or about November 2023, Chow's direct supervisor, Linda Peloquin, spoke up in defense of his performance.  She had supervised his "hang by a tree" investigation and endorsed his termination recommendation.  But yet, Peloquin, too, was then terminated for poor performance.  Her termination came after Peloquin's Tesla HR higher-ups told her that the number of validated race-based complaints at Fremont was too high and that they as HR managers needed to somehow reduce those numbers—particularly in light of all the pending litigation.

In or about December 2023, following those alarming and clearly retaliatory terminations, two HR professionals—Tiara Paulino and Sharnique Martin—drafted and sent an email to high-level operations officials at the Fremont facility explaining, among other things, their fear of retaliation for investigating and validating employees' workplace complaints.  They, too, were fired just weeks later as reprisal.

In or about January 2022, the Fremont facility's Senior Manager of Physical Security Operations, Ozell Murray, was outspoken with his direct supervisor about what Murray perceived to be racially insensitive and insulting direction with respect to new Black would-be hires in the Security Department.  The use of the "N-word" was prevalent throughout the Fremont facility.  A few months prior, one of Murray's direct-reports, a female security officer who was also a former police officer, was victimized when a Tesla employee called her a nigger.  Murray's colleague was so distressed by the incident and the impunity with which the word was used toward her and around the Fremont facility that she had to take a medical leave from work to recover from the trauma.  Yet, instead of offering encouragement, Murray's supervisor, counseled him that Murray should be informing all new Black security personnel that the use of the "N-word" was simply engrained in the culture at Tesla and, so, Murray should only be bringing aboard those that were willing to accept and acquiesce to the prevalence of that word in the workplace.

In or about June 2023, a HR professional named Gregory Vass was unilaterally placed by the overall Fremont HR manager into a "Pride Group."  Vass had not asked to be placed in this group, nor was he aware of any other HR professionals being asked if they wanted to support whatever the mission of the Pride Group was.  The HR manager advised Vass that one of the group's initial projects was to create a slide deck with facts about the LGBTQ community that would be played in the cafeteria to help raise awareness and educate employees.

Vass was profoundly uncomfortable with being unilaterally placed in the Pride Goup since it appeared to him that he was singled out to be a part of the group and execute its mission because of his sexuality. Vass expressed those concerns to his coworkers at the time.

*Complaint – CRD No. 202508-30657707*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

In or about October 2023, Vass voiced his concerns and complaints to the designated HR-for-HR Manager that physically sat in Tesla's Texas headquarters. Yet she, in turn, shared Vass' complaints directly with the Fremont HR manager about whom Vass was complaining. Vass was then terminated five months later as a direct result of that retaliatory animus.

In response to Complainant's protected activities, Tesla retaliated against Complainant, including, but not limited to: harassing and hassling Complainant both during and outside of normal work hours; unreasonably and unjustifiably increasing Complainant's workload; unreasonably and unjustifiably criticizing the speed with which Complainant was completing assignments; unreasonably and unjustifiably criticizing the quality of Complainant's work product and general job execution; questioning and criticizing Complainant for taking sick and disability leave; forcing Complainant to take medical and/or administrative leave; offering and/or placing Complainant onto a sham, last-chance Performance Improvement Plan; and, terminating Complainant's employment.

Complainant's Tesla managers, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Complainant was treated; they were treated more favorably. Thus, Complainant's Tesla managers, as well as their agents and subordinates, personally singled Complainant out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Complainant's employment, ultimately culminating in wrongful termination, because of Complainant's protected activities and characteristics.

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

1 VERIFICATION

2 I, **Terrence Jones**, am the **Attorney** in the above-entitled complaint.  I have read the
3 foregoing complaint and know the contents thereof. The matters alleged are based on
   information and belief, which I believe to be true. The matters alleged are based on
4 information and belief, which I believe to be true.

5 On August 7, 2025, I declare under penalty of perjury under the laws of the State of
   California that the foregoing is true and correct.
6

7 **Los Angeles, CA**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
                                            -5-
                        *Complaint – CRD No. 202508-30657707*
27
   Date Filed: August 7, 2025
28

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Terrence Jones
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:     **Notice to Complainant's Attorney**
CRD Matter Number: 202508-30657807
Right to Sue: Martin / Tesla, Inc.

Dear Terrence Jones:

Attached is a copy of your complaint of discrimination filed with the Civil Rights
Department (CRD) pursuant to the California Fair Employment and Housing Act,
Government Code section 12900 et seq. Also attached is a copy of your Notice of Case
Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

RE:    **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202508-30657807
Right to Sue: Martin / Tesla, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Sharnique Martin
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:     **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202508-30657807
Right to Sue: Martin / Tesla, Inc.

Dear Sharnique Martin:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective August 7, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

# COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**

Sharnique Martin                                                    CRD No. 202508-30657807

                                        Complainant,

vs.

Tesla, Inc.
1 Tesla Road
Austin, TX 78725

                                        Respondents

_____

**1.** Respondent **Tesla, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Sharnique Martin**, resides in the City of **Los Angeles,** State of **CA.**

**3**. Complainant alleges that on or about **February 16, 2024**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's color, sex/gender, sexual orientation, other, association with a member of a protected class, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture).

**Complainant was discriminated against** because of complainant's color, sex/gender, gender identity or expression, sexual orientation, other, association with a member of a protected class, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture) and as a result of the discrimination was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

-1-

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, participated as a witness in a discrimination or harassment complaint and as a result was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

**Additional Complaint Details:** Complainant Sharnique Martin ("Complainant") was subjected to unlawful harassment, discrimination, and retaliation in violation of the Fair Employment and Housing Act (FEHA) on account of Complainant's: perceived race; perceived sexuality; perceived disability; complaints of discriminatory conduct by other employees; and complaints of potential violations of local, state, and federal law.

Complainant was employed by Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." (hereinafter, "Tesla," "Defendant," or the "Company"). Complainant worked as a Human Resources ("HR") professional for the auto production unit of Tesla at its facility in Fremont, California. Complainant began working for Tesla on or about June 13, 2022, and was actually and constructively terminated on or about February 16, 2024.

The proffered basis for Complainant's termination was pretextual. The decision to terminate Complainant, as validated by Tesla's executive staff and managing agents was not truly the result of intentionally-nondescript "performance issues," but was instead rooted in retaliatory and discriminatory animus as a direct consequence of Complainant's objections about Tesla's efforts to minimize and artificially recharacterize the alleged instances of racism and retaliation that HR professionals were responsible for investigating in light of pending litigation against Tesla and the likelihood of exacerbating the company's exposure with newly-validated incidents.

In or about November 2022, an operations manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave. An HR official named Karen Draper refused the operations managers' repeated requests to terminate the employee for taking medica leave since, of course, that would have constituted illegal disability-based retaliation. But yet, Draper was fired for "poor performance."

In or about October 2023, a manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"—plainly threatening to lynch him as were tens of thousands of Black men and women during and after slavery. An HR official, named Adam Chow, investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be physically threatening and racially derogatory, and, so, Chow recommended that the manufacturing employee be terminated. But yet, Chow was chastised and given a poor rating on his performance evaluation. He was then threatened with agreeing to either a "Performance Improvement Plan" with benchmarks that were intentionally unachievable or to a severance package with strict legal

-2-

Date Filed: August 7, 2025

recourse waivers and nondisclosure language.  Either way, the message was clear:  Tesla wanted him gone.  So, Chow had no choice but to resign to avoid that stain on his job record.

In or about November 2023, Chow's direct supervisor, Linda Peloquin, spoke up in defense of his performance.  She had supervised his "hang by a tree" investigation and endorsed his termination recommendation.  But yet, Peloquin, too, was then terminated for poor performance.  Her termination came after Peloquin's Tesla HR higher-ups told her that the number of validated race-based complaints at Fremont was too high and that they as HR managers needed to somehow reduce those numbers—particularly in light of all the pending litigation.

In or about December 2023, following those alarming and clearly retaliatory terminations, two HR professionals—Tiara Paulino and Sharnique Martin—drafted and sent an email to high-level operations officials at the Fremont facility explaining, among other things, their fear of retaliation for investigating and validating employees' workplace complaints.  They, too, were fired just weeks later as reprisal.

In or about January 2022, the Fremont facility's Senior Manager of Physical Security Operations, Ozell Murray, was outspoken with his direct supervisor about what Murray perceived to be racially insensitive and insulting direction with respect to new Black would-be hires in the Security Department.  The use of the "N-word" was prevalent throughout the Fremont facility.  A few months prior, one of Murray's direct-reports, a female security officer who was also a former police officer, was victimized when a Tesla employee called her a nigger.  Murray's colleague was so distressed by the incident and the impunity with which the word was used toward her and around the Fremont facility that she had to take a medical leave from work to recover from the trauma.  Yet, instead of offering encouragement, Murray's supervisor, counseled him that Murray should be informing all new Black security personnel that the use of the "N-word" was simply engrained in the culture at Tesla and, so, Murray should only be bringing aboard those that were willing to accept and acquiesce to the prevalence of that word in the workplace.

In or about June 2023, a HR professional named Gregory Vass was unilaterally placed by the overall Fremont HR manager into a "Pride Group."  Vass had not asked to be placed in this group, nor was he aware of any other HR professionals being asked if they wanted to support whatever the mission of the Pride Group was.  The HR manager advised Vass that one of the group's initial projects was to create a slide deck with facts about the LGBTQ community that would be played in the cafeteria to help raise awareness and educate employees.

Vass was profoundly uncomfortable with being unilaterally placed in the Pride Group since it appeared to him that he was singled out to be a part of the group and execute its mission because of his sexuality. Vass expressed those concerns to his coworkers at the time.

*Complaint – CRD No. 202508-30657807*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

1      In or about October 2023, Vass voiced his concerns and complaints to the
2  designated HR-for-HR Manager that physically sat in Tesla's Texas headquarters.  Yet she,
   in turn, shared Vass' complaints directly with the Fremont HR manager about whom Vass
3  was complaining.  Vass was then terminated five months later as a direct result of that
   retaliatory animus.

4      In response to Complainant's protected activities, Tesla retaliated against
5  Complainant, including, but not limited to: harassing and hassling Complainant both during
   and outside of normal work hours; unreasonably and unjustifiably increasing Complainant's
6  workload; unreasonably and unjustifiably criticizing the speed with which Complainant was
7  completing assignments; unreasonably and unjustifiably criticizing the quality of
   Complainant's work product and general job execution; questioning and criticizing
8  Complainant for taking sick and disability leave; forcing Complainant to take medical and/or
   administrative leave; offering and/or placing Complainant onto a sham, last-chance
9  Performance Improvement Plan; and, terminating Complainant's employment.

10     Complainant's Tesla managers, as well as their agents and subordinates, did not
   treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-
11 identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which
   Complainant was treated; they were treated more favorably.  Thus, Complainant's Tesla
12 managers, as well as their agents and subordinates, personally singled Complainant out for
13 disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and
   privileges of Complainant's employment, ultimately culminating in wrongful termination,
   because of Complainant's protected activities and characteristics.

14

15

16

17

18

19

20

21

22

23

24

25

26
*Complaint – CRD No. 202508-30657807*
27
Date Filed: August 7, 2025
28

CRD-ENF 80 RS (Revised 2025/02)

1  VERIFICATION

2  I, **Terrence Jones**, am the **Attorney** in the above-entitled complaint.  I have read the
3  foregoing complaint and know the contents thereof. The matters alleged are based on
   information and belief, which I believe to be true. The matters alleged are based on
4  information and belief, which I believe to be true.

5  On August 7, 2025, I declare under penalty of perjury under the laws of the State of
   California that the foregoing is true and correct.
6

7                                                                    **Los Angeles, CA**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                    -5-
27
   Date Filed: August 7, 2025
28
                                                        CRD-ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Terrence Jones
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:     **Notice to Complainant's Attorney**
        CRD Matter Number: 202508-30658007
        Right to Sue: Vass / Tesla, Inc.

Dear Terrence Jones:

Attached is a copy of your complaint of discrimination filed with the Civil Rights
Department (CRD) pursuant to the California Fair Employment and Housing Act,
Government Code section 12900 et seq. Also attached is a copy of your Notice of Case
Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

RE:     **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202508-30658007
Right to Sue: Vass / Tesla, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Gregory Vass
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:    **Notice of Case Closure and Right to Sue**
       CRD Matter Number: 202508-30658007
       Right to Sue: Vass / Tesla, Inc.

Dear Gregory Vass:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective August 7, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**Civil Rights Department**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Gregory Vass                                   CRD No. 202508-30658007

                          Complainant,

vs.

Tesla, Inc.
1 Tesla Road
Austin, TX 78725

                          Respondents

---

**1.** Respondent **Tesla, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Gregory Vass**, resides in the City of **Los Angeles,** State of **CA.**

**3**. Complainant alleges that on or about **March 22, 2024**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's gender identity or expression, sexual orientation, medical condition (cancer or genetic characteristic), other, association with a member of a protected class.

**Complainant was discriminated against** because of complainant's sex/gender, gender identity or expression, sexual orientation, other, association with a member of a protected class, disability (physical, intellectual/developmental, mental health/psychiatric) and as a result of the discrimination was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, denied any employment benefit or privilege, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, participated as a witness in a discrimination or harassment

-1-
*Complaint – CRD No. 202508-30658007*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

complaint and as a result was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, given additional work responsibilities or assignments.

**Additional Complaint Details:** Complainant Gregory Vass ("Complainant") was subjected to unlawful harassment, discrimination, and retaliation in violation of the Fair Employment and Housing Act (FEHA) on account of Complainant's: perceived race; perceived sexuality; perceived disability; complaints of discriminatory conduct by other employees; and complaints of potential violations of local, state, and federal law.

Complainant was employed by Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." (hereinafter, "Tesla," "Defendant," or the "Company"). Complainant worked as a Human Resources ("HR") professional for the auto production unit of Tesla at its facility in Fremont, California.  Complainant began working for Tesla on or about June 1, 2022, and was actually and constructively terminated on or about March 22, 2024.

The proffered basis for Complainant's termination was pretextual.  The decision to terminate Complainant, as validated by Tesla's executive staff and managing agents was not truly the result of intentionally-nondescript "performance issues," but was instead rooted in retaliatory and discriminatory animus as a direct consequence of Complainant's objections about Tesla's efforts to minimize and artificially recharacterize the alleged instances of racism and retaliation that HR professionals were responsible for investigating in light of pending litigation against Tesla and the likelihood of exacerbating the company's exposure with newly-validated incidents.

In or about November 2022, an operations manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave.  An HR official named Karen Draper refused the operations managers' repeated requests to terminate the employee for taking medica leave since, of course, that would have constituted illegal disability-based retaliation.  But yet, Draper was fired for "poor performance."

In or about October 2023, a manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"—plainly threatening to lynch him as were tens of thousands of Black men and women during and after slavery.  An HR official, named Adam Chow, investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be physically threatening and racially derogatory, and, so, Chow recommended that the manufacturing employee be terminated. But yet, Chow was chastised and given a poor rating on his performance evaluation.  He was then threatened with agreeing to either a "Performance Improvement Plan" with benchmarks that were intentionally unachievable or to a severance package with strict legal recourse waivers and nondisclosure language.  Either way, the message was clear:  Tesla

-2-
*Complaint – CRD No. 202508-30658007*

Date Filed: August 7, 2025

wanted him gone.  So, Chow had no choice but to resign to avoid that stain on his job record.

In or about November 2023, Chow's direct supervisor, Linda Peloquin, spoke up in defense of his performance.  She had supervised his "hang by a tree" investigation and endorsed his termination recommendation.  But yet, Peloquin, too, was then terminated for poor performance.  Her termination came after Peloquin's Tesla HR higher-ups told her that the number of validated race-based complaints at Fremont was too high and that they as HR managers needed to somehow reduce those numbers—particularly in light of all the pending litigation.

In or about December 2023, following those alarming and clearly retaliatory terminations, two HR professionals—Tiara Paulino and Sharnique Martin—drafted and sent an email to high-level operations officials at the Fremont facility explaining, among other things, their fear of retaliation for investigating and validating employees' workplace complaints.  They, too, were fired just weeks later as reprisal.

In or about January 2022, the Fremont facility's Senior Manager of Physical Security Operations, Ozell Murray, was outspoken with his direct supervisor about what Murray perceived to be racially insensitive and insulting direction with respect to new Black would-be hires in the Security Department.  The use of the "N-word" was prevalent throughout the Fremont facility.  A few months prior, one of Murray's direct-reports, a female security officer who was also a former police officer, was victimized when a Tesla employee called her a nigger.  Murray's colleague was so distressed by the incident and the impunity with which the word was used toward her and around the Fremont facility that she had to take a medical leave from work to recover from the trauma.  Yet, instead of offering encouragement, Murray's supervisor, counseled him that Murray should be informing all new Black security personnel that the use of the "N-word" was simply engrained in the culture at Tesla and, so, Murray should only be bringing aboard those that were willing to accept and acquiesce to the prevalence of that word in the workplace.

In or about June 2023, a HR professional named Gregory Vass was unilaterally placed by the overall Fremont HR manager into a "Pride Group."  Vass had not asked to be placed in this group, nor was he aware of any other HR professionals being asked if they wanted to support whatever the mission of the Pride Group was.  The HR manager advised Vass that one of the group's initial projects was to create a slide deck with facts about the LGBTQ community that would be played in the cafeteria to help raise awareness and educate employees.

Vass was profoundly uncomfortable with being unilaterally placed in the Pride Goup since it appeared to him that he was singled out to be a part of the group and execute its mission because of his sexuality. Vass expressed those concerns to his coworkers at the time.

In or about October 2023, Vass voiced his concerns and complaints to the designated HR-for-HR Manager that physically sat in Tesla's Texas headquarters.  Yet she,

-3-
*Complaint – CRD No. 202508-30658007*

1    in turn, shared Vass' complaints directly with the Fremont HR manager about whom Vass
2    was complaining.  Vass was then terminated five months later as a direct result of that
     retaliatory animus.

3         In response to Complainant's protected activities, Tesla retaliated against
4    Complainant, including, but not limited to: harassing and hassling Complainant both during
     and outside of normal work hours; unreasonably and unjustifiably increasing Complainant's
5    workload; unreasonably and unjustifiably criticizing the speed with which Complainant was
     completing assignments; unreasonably and unjustifiably criticizing the quality of
6    Complainant's work product and general job execution; questioning and criticizing
     Complainant for taking sick and disability leave; forcing Complainant to take medical and/or
7    administrative leave; offering and/or placing Complainant onto a sham, last-chance
     Performance Improvement Plan; and, terminating Complainant's employment.
8
9         Complainant's Tesla managers, as well as their agents and subordinates, did not
     treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-
10   identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which
     Complainant was treated; they were treated more favorably.  Thus, Complainant's Tesla
11   managers, as well as their agents and subordinates, personally singled Complainant out for
     disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and
12   privileges of Complainant's employment, ultimately culminating in wrongful termination,
     because of Complainant's protected activities and characteristics.

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                          -4-
                              *Complaint – CRD No. 202508-30658007*
27
     Date Filed: August 7, 2025
28

                                                          CRD-ENF 80 RS (Revised 2025/02)

1  VERIFICATION

2  I, **Terrence Jones**, am the **Attorney** in the above-entitled complaint.  I have read the
3  foregoing complaint and know the contents thereof. The matters alleged are based on
   information and belief, which I believe to be true. The matters alleged are based on
4  information and belief, which I believe to be true.

5  On August 7, 2025, I declare under penalty of perjury under the laws of the State of
   California that the foregoing is true and correct.
6

7                                                          **Los Angeles, CA**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                       -5-
                            *Complaint – CRD No. 202508-30658007*
27
   Date Filed: August 7, 2025
28

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Terrence Jones
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:    **Notice to Complainant's Attorney**
CRD Matter Number: 202508-30658207
Right to Sue: Murray / Tesla, Inc.

Dear Terrence Jones:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

RE:   **Notice of Filing of Discrimination Complaint**
      CRD Matter Number: 202508-30658207
      Right to Sue: Murray / Tesla, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil
Rights Department (CRD) in accordance with Government Code section 12960. This
constitutes service of the complaint pursuant to Government Code section 12962. The
complainant has requested an authorization to file a lawsuit. A copy of the Notice of
Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation
Program. Under this program, established under Government Code section
12945.21, a small employer with 5 -19 employees, charged with violation of the
California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave
(Government Code sections 12945.2, 12945.6, or 12945.7) has the right to
participate in CRD's free mediation program. Under this program both the
employee requesting an immediate right to sue and the employer charged with
the violation may request that all parties participate in CRD's free mediation
program. The employee is required to contact the Department's Dispute
Resolution Division prior to filing a civil action and must also indicate whether
they are requesting mediation.  The employee is prohibited from filing a civil
action unless the Department does not initiate mediation within the time period
specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. You may
contact CRD's Small Employer Family Leave Mediation Pilot Program by
emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter
number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their
contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 7, 2025

Ozell Murray
5120 Goldleaf Circle, Suite 425
Los Angeles, CA 90056

RE:     **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202508-30658207
Right to Sue: Murray / Tesla, Inc.

Dear Ozell Murray:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective August 7, 2025 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2025/02)

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**Civil Rights Department**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Ozell Murray                                                 CRD No. 202508-30658207

                              Complainant,

vs.

Tesla, Inc.
1 Tesla Road
Austin, TX 78725

                              Respondents

---

**1.** Respondent **Tesla, Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Ozell Murray**, resides in the City of **Los Angeles,** State of **CA.**

**3.** Complainant alleges that on or about **September 12, 2024**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's color, association with a member of a protected class, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture).

**Complainant was discriminated against** because of complainant's color, medical condition (cancer or genetic characteristic), other, association with a member of a protected class, disability (physical, intellectual/developmental, mental health/psychiatric), race (includes hairstyle and hair texture) and as a result of the discrimination was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, denied family care and medical leave (cfra) related to serious health condition of employee or family member, child bonding, or military exigencies, given additional work responsibilities or assignments.

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a disability-related accommodation, participated as a witness in a discrimination or harassment complaint, requested or used family care and medical leave (cfra) related to serious health condition of employee or family member, child bonding, or military exigencies, requested or used leave to obtain victim of violence-related services, requested or used safety-related accommodation for a victim of violence and as a result was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, suspended, demoted, other, denied work opportunities or assignments, denied or forced to transfer, denied accommodation for a disability, denied leave to obtain victim of violence-related services, given additional work responsibilities or assignments.

**Additional Complaint Details:** Complainant Ozell Murray ("Complainant") was subjected to unlawful harassment, discrimination, and retaliation in violation of the Fair Employment and Housing Act (FEHA) on account of Complainant's: perceived race; perceived sexuality; perceived disability; complaints of discriminatory conduct by other employees; and complaints of potential violations of local, state, and federal law.

Complainant was employed by Tesla, Inc., a Delaware corporation doing business in California as "Tesla Motors, Inc." (hereinafter, "Tesla," "Defendant," or the "Company"). Complainant worked as a Human Resources ("HR") professional for the auto production unit of Tesla at its facility in Fremont, California. Complainant began working for Tesla on or about September 1, 2018, and was actually and constructively terminated on or about September 12, 2024.

The proffered basis for Complainant's termination was pretextual. The decision to terminate Complainant, as validated by Tesla's executive staff and managing agents was not truly the result of intentionally-nondescript "performance issues," but was instead rooted in retaliatory and discriminatory animus as a direct consequence of Complainant's objections about Tesla's efforts to minimize and artificially recharacterize the alleged instances of racism and retaliation that HR professionals were responsible for investigating in light of pending litigation against Tesla and the likelihood of exacerbating the company's exposure with newly-validated incidents.

In or about November 2022, an operations manager had a rabid and irrational desire to fire an employee because she had taken a statutorily-protected medical leave. An HR official named Karen Draper refused the operations managers' repeated requests to terminate the employee for taking medica leave since, of course, that would have constituted illegal disability-based retaliation. But yet, Draper was fired for "poor performance."

In or about October 2023, a manufacturing employee made an angry comment to a Black employee, asking him, "Do you want to hang by a tree?"—plainly threatening to lynch him as were tens of thousands of Black men and women during and after slavery. An HR official, named Adam Chow, investigated the Black employee's complaint, the investigation confirmed that the comment was indeed intended to be physically threatening and racially

-2-
*Complaint – CRD No. 202508-30658207*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

derogatory, and, so, Chow recommended that the manufacturing employee be terminated. But yet, Chow was chastised and given a poor rating on his performance evaluation. He was then threatened with agreeing to either a "Performance Improvement Plan" with benchmarks that were intentionally unachievable or to a severance package with strict legal recourse waivers and nondisclosure language. Either way, the message was clear: Tesla wanted him gone. So, Chow had no choice but to resign to avoid that stain on his job record.

In or about November 2023, Chow's direct supervisor, Linda Peloquin, spoke up in defense of his performance. She had supervised his "hang by a tree" investigation and endorsed his termination recommendation. But yet, Peloquin, too, was then terminated for poor performance. Her termination came after Peloquin's Tesla HR higher-ups told her that the number of validated race-based complaints at Fremont was too high and that they as HR managers needed to somehow reduce those numbers—particularly in light of all the pending litigation.

In or about December 2023, following those alarming and clearly retaliatory terminations, two HR professionals—Tiara Paulino and Sharnique Martin—drafted and sent an email to high-level operations officials at the Fremont facility explaining, among other things, their fear of retaliation for investigating and validating employees' workplace complaints. They, too, were fired just weeks later as reprisal.

In or about January 2022, the Fremont facility's Senior Manager of Physical Security Operations, Ozell Murray, was outspoken with his direct supervisor about what Murray perceived to be racially insensitive and insulting direction with respect to new Black would-be hires in the Security Department. The use of the "N-word" was prevalent throughout the Fremont facility. A few months prior, one of Murray's direct-reports, a female security officer who was also a former police officer, was victimized when a Tesla employee called her a nigger. Murray's colleague was so distressed by the incident and the impunity with which the word was used toward her and around the Fremont facility that she had to take a medical leave from work to recover from the trauma. Yet, instead of offering encouragement, Murray's supervisor, counseled him that Murray should be informing all new Black security personnel that the use of the "N-word" was simply engrained in the culture at Tesla and, so, Murray should only be bringing aboard those that were willing to accept and acquiesce to the prevalence of that word in the workplace.

In or about June 2023, a HR professional named Gregory Vass was unilaterally placed by the overall Fremont HR manager into a "Pride Group." Vass had not asked to be placed in this group, nor was he aware of any other HR professionals being asked if they wanted to support whatever the mission of the Pride Group was. The HR manager advised Vass that one of the group's initial projects was to create a slide deck with facts about the LGBTQ community that would be played in the cafeteria to help raise awareness and educate employees.

Vass was profoundly uncomfortable with being unilaterally placed in the Pride Goup since it appeared to him that he was singled out to be a part of the group and execute its

-3-
*Complaint – CRD No. 202508-30658207*

Date Filed: August 7, 2025

mission because of his sexuality. Vass expressed those concerns to his coworkers at the time.

In or about October 2023, Vass voiced his concerns and complaints to the designated HR-for-HR Manager that physically sat in Tesla's Texas headquarters.  Yet she, in turn, shared Vass' complaints directly with the Fremont HR manager about whom Vass was complaining.  Vass was then terminated five months later as a direct result of that retaliatory animus.

In response to Complainant's protected activities, Tesla retaliated against Complainant, including, but not limited to: harassing and hassling Complainant both during and outside of normal work hours; unreasonably and unjustifiably increasing Complainant's workload; unreasonably and unjustifiably criticizing the speed with which Complainant was completing assignments; unreasonably and unjustifiably criticizing the quality of Complainant's work product and general job execution; questioning and criticizing Complainant for taking sick and disability leave; forcing Complainant to take medical and/or administrative leave; offering and/or placing Complainant onto a sham, last-chance Performance Improvement Plan; and, terminating Complainant's employment.

Complainant's Tesla managers, as well as their agents and subordinates, did not treat non-complaining, non-objecting, non-outspoken, non-Black, non-Asian, non-female-identifying, non-disabled, non-LGBTQ-identifying employees in the same manner in which Complainant was treated; they were treated more favorably.  Thus, Complainant's Tesla managers, as well as their agents and subordinates, personally singled Complainant out for disparate treatment, harassment, retaliation, and with regard to the terms, conditions, and privileges of Complainant's employment, ultimately culminating in wrongful termination, because of Complainant's protected activities and characteristics.

-4-
*Complaint – CRD No. 202508-30658207*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)

VERIFICATION

I, **Terrence Jones**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true. The matters alleged are based on information and belief, which I believe to be true.

On August 7, 2025, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Los Angeles, CA**

-5-

*Complaint – CRD No. 202508-30658207*

Date Filed: August 7, 2025

CRD-ENF 80 RS (Revised 2025/02)